NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2018 VT 101

No. 2017-239

| | |
|---|---|
| Kneebinding, Inc., John Springer-Miller, Tina Springer-Miller and ACL Investments, LLC | Supreme Court |
| v. | On Appeal from Superior Court, Lamoille Unit, Civil Division |
| Richard Howell | February Term, 2018 |

Alden T. Bryan J. (Ret.), Specially Assigned

Peter G. Anderson of Anderson & Associates, Stowe, for Plaintiffs-Appellants/Cross-Appellees.

Richard J. Howell, Pro Se, Stowe, Defendant-Appellee/Cross-Appellant.

PRESENT: Reiber, C.J., Skoglund, Robinson, Eaton and Carroll, JJ.

¶ 1. **ROBINSON, J.** This case comes to us after a lengthy bench trial between appellants/cross-appellees Kneebinding, Inc. (Kneebinding) and Kneebinding company directors John and Tina Springer-Miller (the Springer-Millers), and appellee/cross-appellant Richard Howell (Howell) that resulted in a series of interlocutory decisions before final judgment. Kneebinding and the Springer-Millers appeal the trial court's decisions regarding: (1) a stipulated fine for Howell's alleged violations of an injunction prohibiting him from speaking in certain settings about Kneebinding or the Springer-Millers; (2) termination of the injunction; (3) other contempt sanctions for Howell's alleged violations of the injunction; (4) defamation damages; (5) Kneebinding's claim of tortious interference with contract; and (6) attorney's fees. With respect to their appeal, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion. Howell appeals the trial court's denial of his third-party shareholder

derivative and direct claims against the Springer-Millers for fraud in the inducement and various alleged breaches of fiduciary duties. We affirm the trial court's judgment on these claims.[1]

¶ 2. The saga underlying these disputes, as found by the trial court, and the procedural history of this case are as follows. Kneebinding was incorporated in Delaware and has its principle place of business in Stowe, Vermont. The company manufactures ski bindings that feature a special, patented heel release designed to mitigate knee injuries—especially those to the anterior cruciate ligament—that are common in downhill skiing.

¶ 3. Howell invented and patented the binding in 2003, formed Kneebinding shortly thereafter, and began to look for investors. He has an extensive personal and professional background in the ski industry, having been an accomplished ski racer as a youth, a marketing director of a major ski binding company, and an active participant in the international community of ski professionals and academics.

¶ 4. At some point in his quest to raise capital, Howell met John Springer-Miller, who had previous business success and was positioned to be a significant investor. The two began negotiations in the spring of 2007 and continued through that summer. These negotiations quickly became strained. Howell wanted a significant investment, but he also wanted to remain in control of the company. For his part, John Springer-Miller had reservations about Howell's business experience and ability build the project into a highly valuable company.

¶ 5. The issue of company control became a sticking point in the negotiations, which reached an apparent impasse in the fall of 2007. In October of that year, Howell wrote an e-mail to John Springer-Miller requesting a formal end to the negotiations. Springer-Miller responded by stating how sorry he was that the deal would not go through, noting, "with your invention and my business savvy, [we] could have made a whole lot of money." (Emphasis omitted). Howell

---

[1] During the course of these appeal proceedings, Howell moved for sanctions against Kneebinding and the Springer-Millers' attorney for what Howell considered to be false representations made by the attorney. These motions are denied.

responded by lamenting that Springer-Miller continued to underestimate his business savvy and that he brought more to the table than just his invention. Springer-Miller's reply stated that he did not want to run the company; rather his "goal in [the] negotiations ha[d] been to lock [Howell] into a business plan that [would] really work—that [would] allow [Howell] to focus all [his] time on building the business—and to protect [Springer-Miller's] investment if [Howell] [did] not succeed."

¶ 6.    The two continued to negotiate over the next few days, but on October 17, John Springer-Miller wrote to Howell seeking to once again cease negotiations; he explained that the two were "on completely different planets" and that Howell "deserve[d] an investor who believes in [him] as much as the product." That same morning, however, Howell appeared at Springer-Miller's residence and they resumed negotiations. By the end of their meeting, the two agreed to a deal that would give Springer-Miller control over the board of directors, with Howell retaining minority ownership and his leadership of the company as President and CEO.

¶ 7.    Howell and John Springer-Miller signed transaction documents on November 1, 2007, including an employment agreement, a Series A-stock-purchase agreement ("stock-purchase agreement"), an amended and restated certificate of incorporation of Kneebinding, a non-competition and non-solicitation agreement, an invention and non-disclosure agreement, a company voting-rights agreement, and an investor-rights agreement. After the closing, Springer-Miller owned 1,065,000 shares of Series A-preferred-stock in return for an investment of $1,065,000. Howell was a minority shareholder with 641,772 shares of common stock, with two other minority shareholders owning 36,321 and 3279 shares of common stock, respectively.

¶ 8.    Pursuant to the voting-rights agreement, the board of directors could consist of five total members. Howell, as the "founder," was allowed to select one director, the holders of the Series A preferred stock could select three directors, and Howell and the Springer-Millers could

3

select a fifth director together. Initially, the board was comprised of the Springer-Millers and Howell.

¶ 9. Pursuant to the parties' agreement, Howell was to serve as president, CEO, secretary, and treasurer with duties and responsibilities ultimately controlled by the board. His employment, however, was "at-will." John Springer-Miller was to serve as the company's chief financial officer (CFO). The Springer-Millers, as the Series A preferred shareholders, had control over the company funds, including an investment account that could not be accessed without their permission. Howell was in control of the day-to-day company operations—including production and marketing—but had no control over company funds until they were transferred from the investment account to the operating account. John Springer-Miller, on the other hand, "invested the funds and in all major respects had final control over everything of financial importance that was to happen in the Company."

¶ 10. Howell and John Springer-Miller's working relationship began to deteriorate almost immediately. By December 2007—a little over a month after the closing—Howell wrote to corporate counsel looking for a way to remove Springer-Miller as CFO due to what Howell perceived as his overly controlling nature. Howell began to purposefully withhold company information from the Springer-Millers, and he directed others in the company to do the same. Communication was a problem between Howell and Springer-Miller throughout Howell's employment at Kneebinding.

¶ 11. By February 2008, their relationship had become such that Howell would communicate only through his personal attorney. This attorney wrote first to John Springer-Miller, and then to Springer-Miller's attorney, alleging that Springer-Miller had violated the parties' agreement by: threatening to remove Howell; failing to hold board meetings; interfering with potential customers; failing to provide necessary financing; providing for an inadequate company website; failing to deliver engineering support; and failing to inform Howell of his intended

4

amendments to the business plans.[2]  John Springer-Miller responded by relaying through his attorney that if Howell wanted to communicate about these matters, then he preferred to do so face-to-face rather than through counsel.

¶ 12.    In addition to the communication issues, the Springer-Millers grew unhappy with Howell's general job performance.  The original business and financial plan—drafted by Howell and pitched to John Springer-Miller to entice his investment—projected that the company would complete binding production molds by April 2008 and subcomponent binding parts by June or July, and would sell 30,000 pairs of bindings from July 2008 through June 2009.  The plans described that a specific local vendor "who '[was] enthusiastic about being engaged in another successful project with [Howell]' " would do the injection molding.  The trial court found that this manufacturing forecast was "overly optimistic" and "[a]s a sales pitch to an investor, it was a borderline misrepresentation."  In reality, the computer-aided design of the bindings was not yet in place to allow the vendor to complete the production molds—a process that would take months to complete.  Due to this, and Howell's contentious working relationship with the company's plastics vendor, the company fell seriously behind its projected schedule.  The production molds that were supposed to be ready by the spring of 2008 were not completed as of that summer, which meant that there was no binding to demonstrate for potential customers.  By the end of the summer of 2008, Kneebinding was nowhere close to its sales projections for the 2008-2009 ski season, and the critical time to garner sales for the season had passed.

¶ 13.    In September 2008, the board voted to terminate Howell as president and CEO. The board offered, however, to continue Howell's employment as a consultant.  Howell rejected

---

[2]  Notably, in one such correspondence, Howell's attorney represented that "[d]espite the acts and omissions by [Springer-Miller] . . . [Howell] is proceeding as best he can with the implementation of the business plan and has been remarkably successful.  For example, last week he was able to obtain an order for [3000] bindings valued at approximately $875,000 from REI." In fact, during Howell's time as CEO and president of Kneebinding, there was never an order for 3000 bindings from any distributer—REI did indeed place an order, but it was for sixty bindings.

this offer and ultimately signed a severance agreement in December 2008. He eventually resigned from the board but kept his minority share of the company. After Howell's departure, the company proceeded under the leadership of the Springer-Millers.

¶ 14. In March 2009, Kneebinding filed for an ex parte, temporary restraining order (TRO) in superior court, alleging that Howell had violated the confidentiality and nondisparagement portion of the parties' severance agreement. The court's order granting the TRO noted Kneebinding's proffered evidence that Howell had violated this agreement with Kneebinding and had "revealed confidential, proprietary information regarding Kneebinding and its products in the context of disparaging comments and web postings that are likely to reach Kneebinding's existing and potential clients, vendors and investors." The TRO ordered Howell not to publish oral or written statements relating to Kneebinding to any "current or potential customer, client, investor, and vendor." Howell responded by picketing in front of the courthouse with a sign stating that "Kneebinding was 100% defective," prompting Kneebinding to file a motion for contempt.

¶ 15. On March 30, 2009, after a day of negotiations, the parties reached two agreements: a stipulation for a permanent injunction and a stipulation regarding contempt—both of which the superior court signed into orders.

¶ 16. The stipulation for a permanent injunction states that Howell stipulated to a finding that he was in contempt of the TRO and agreed to a "permanent injunction" ordering, among other things, that:

> (1) [Howell] shall not publish or cause to be published any communication, oral or written, that relates to KneeBinding, its products, or John or Tina Springer-Miller or any of its other principals to any current or potential customer, client, investor or vendor.
>
> (2) [Howell] shall not publish or cause to be published any communication, oral or written, that has a reasonable likelihood to create confusion as to whether he speaks or acts on behalf of

6

> KneeBinding, its products, or John or Tina Springer-Miller or any of its other principals.
>
> (3) [Howell] shall forthwith remove, delete or destroy, and to the extent not within his possession, custody or control, make his best efforts to remove, delete or destroy any communications within his possession, custody, or control that fall within paragraphs 1 and 2 of this Order . . . .[3]

¶ 17.  The stipulation regarding contempt said that Howell had violated the TRO by knowingly and deliberately posting to a blog on the internet and picketing in front of the court.  It stated, "[a]n appropriate sanction for the contempt is that Howell be fined [$7000], BUT, shall be relieved of the obligation to pay the fine if he does not further violate the Temporary Restraining Order or the permanent injunction prior to September 15, 2009."[4]

¶ 18.  In March 2009, Kneebinding filed the underlying suit against Howell, alleging trademark infringement, violations of the nondisparagement and noncompete provisions of their agreement, tortious interference with contract, defamation, and misappropriation of trade secrets.  Howell answered and counterclaimed, alleging defamation, breach of contract, invasion of privacy, misappropriation, unfair competition, patent violations, tortious interference with business relations, and intentional infliction of emotional distress.

¶ 19.  In 2012, the trial court granted Kneebinding's motion for partial summary judgment, ruling that the release provision in the parties' severance agreement barred all of

---

[3] In April 2009, pursuant to Howell's motion, the court modified the injunction to allow him to attend and give a presentation at a ski-safety conference in Germany, but he was to provide audio recordings of his presentation to the court after the conference, and he could not speak about any specific ski binding or discuss the application of the science to ski bindings.

[4] In April 2009, the parties entered into yet a third signed agreement, stating that Howell would contact an international ski-safety organization to request that it not publish his abstract, contact other organizations to request that they not post his communications regarding lateral-heel-release bindings, and "[c]ease and desist from making any statements of any kind about KneeBinding to anyone, including anyone in the scientific, business, or lay community."  The agreement further provided that Howell notify Kneebinding no later than April 17, 2009 of his steps to comply with the letter agreement, and that failure to comply with the agreement would violate the permanent injunction.

7

Howell's counterclaims, except for his claims for alleged misappropriation of his name and skills, defamation, and intentional infliction of emotional distress. This Court affirmed the ruling on interlocutory appeal. Kneebinding, Inc. v. Howell, 2014 VT 51, ¶ 1, 196 Vt. 477, 99 A.3d 612.

¶ 20. In July 2012, while the trial court was considering Kneebinding's motion for summary judgment, Howell filed a third-party direct and shareholder derivative complaint against the Springer-Millers and ACL Investments, LLC—a corporation the Springer-Millers established to hold their Kneebinding Series A preferred stock. This complaint initially presented a scatter-shot collection of issues,[5] but by the time of the bench-trial decision in August 2016, the trial court determined that what remained of Howell's counterclaims and third-party claims were his derivative claims for fraud in the inducement, violations of the Vermont Securities Act, numerous breaches of fiduciary duty, and unjust enrichment, as well as his direct claim of defamation.[6]

¶ 21. After the March 2009 stipulated orders concerning Howell's contempt with respect to the TRO and the permanent injunction, Kneebinding moved for contempt sanctions in 2010 and 2012, alleging that Howell violated the injunction, thereby triggering the $7000 fine provision in the stipulation regarding contempt, through various verbal statements and internet posts claiming the company's bindings were defective and unsafe.

¶ 22. The trial court decided to hear the parties' claims—Kneebinding's various claims and motions for sanctions and Howell's third-party direct and derivative claims—in one trial that

---

[5] The claims included fraud, conversion, unjust enrichment, constructive trust, rescission and restitution, breach of contract, tortious interference in business relations, breach of fiduciary duties, securities fraud, defamation, violations of the federal Electronic Communications Privacy Act, violation of the federal Stored Communications Privacy Act, invasion of privacy, unfair competition, intentional infliction of emotional distress, fraudulent conveyance, wrongful use of civil proceedings, and civil conspiracy.

[6] The court explained in its August 2016 decision that "much of the counterclaim was disposed of by the partial motion for summary judgment" and "[t]he remaining claims were either subsumed into the claims in the third-party complaint or abandoned following the trial. The counterclaims are not mentioned in the post-trial memoranda and are considered abandoned as requiring a separate ruling from the issues in the third-party action." Howell has not challenged this conclusion on appeal.

lasted twenty days from November to December 2015. In a lengthy decision issued in August 2016, the court ruled against Howell on his derivative claims and direct defamation claim.[7] Regarding Kneebinding's claims, the court ruled that Howell had violated paragraph one of the injunction, had done so in a manner that carried the "potential" for the $7000 stipulated fine, and directed the parties to present further briefing on the question. In addition, the court ruled that Howell had defamed Kneebinding and permitted the company to present evidence of defamation damages at a future hearing. The court ruled against Kneebinding on its tortious-interference-with-contract claim because Kneebinding had not proven that Howell's communication with its plastic vendor, which was the basis for Kneebinding's claim, resulted in actual damage to Kneebinding. Finally, the court left open the possibility of awarding attorney's fees, to be determined in a subsequent decision after further briefing and evidence.

¶ 23. The court then issued a series of interlocutory decisions from January through April 2017 addressing Kneebinding's motions urging the court to impose the $7000 stipulated fine as well as other contempt sanctions, Kneebinding's defamation damages, and Kneebinding's and the Springer-Millers' claims for attorney's fees. The court ruled that Howell had violated paragraph one of the injunction, but it terminated the injunction going forward and declined to impose the

---

[7] In September 2016, Howell filed a Vermont Rule of Civil Procedure 59(e) motion requesting the court's reconsideration. With respect to the contempt finding against him, he argued that the court had ignored his post-trial briefing on the injunction being a prior restraint on speech and that he had "active[ly] contest[ed] the consent order for seven years" without a ruling on the issue. In addition, Howell requested that the court reconsider its rulings on his third-party derivative breach of fiduciary duty claims. He contended that the court had not closely scrutinized John Springer-Miller's actions as a controlling shareholder and director regarding his conflicts of interest and adherence to the company's business and financial plan. In November 2016, the court denied Howell's motions. Regarding Howell's motion to reconsider his contempt claim, the court noted that in its decision it had addressed his claim that the injunction was unconstitutional. The court explained that Howell's previous attempts to invalidate the injunction had been denied without prejudice so that he could raise the claim at trial, but that this did not change its conclusion regarding contempt. Regarding Howell's motion to reconsider his breach-of-fiduciary-duty claims, the court concluded that it provided the appropriate level of scrutiny to John Springer-Miller's behavior as a board member and that Howell had failed to prove at trial that Springer-Miller had breached his fiduciary duties.

stipulated fine or any other monetary sanction for Howell's contempt.[8]  The court awarded Kneebinding $3500 in damages on its defamation claim.  And the court awarded Kneebinding $22,433.42 in attorney's fees for litigating its contempt claim and denied the Springer-Millers' claim for attorney's fees.  In May 2017, the court issued its final judgment resolving all claims.

¶ 24.   On appeal, Kneebinding and the Springer-Millers argue that the trial court abused its discretion by: (1) issuing a string of decisions in early 2017 that reversed many of the findings and conclusions from its August 2016 decision; (2) declining to impose the $7000 stipulated contempt fine for violating the TRO, declining to assess other contempt sanctions against Howell for repeatedly violating the injunction, and vacating the permanent injunction; (3) awarding only $3500 for general defamation damages and nothing for punitive damages; (4) ruling for Howell on Kneebinding's tortious-interference-with-contract claim; and (5) ruling that Kneebinding was entitled to attorney's fees on only its contempt claim and then awarding only a partial sum of attorney's fees for that claim, while awarding no attorney's fees to the Springer-Millers.[9]

---

[8] In July 2017, Kneebinding moved, pursuant to Vermont Rule of Civil Procedure 62(d)(2), to restore the injunction pending appeal.  In August 2017, the court granted the motion in part and reinstated, for the duration of the appeal, paragraph one of the injunction, amended to read:

> (1)  [Howell] shall not publish or cause to be published any false, disparaging, or derogatory communication, oral or written, regarding KneeBinding, Inc., its products, John or Tina Springer-Miller, or any other KneeBinding principal, to any media outlet, industry group, current or potential customer, client, investor, or vendor.

[9] The "questions presented" section of Kneebinding's brief outlines additional challenges to the trial court's rulings on Kneebinding's claims for Howell's alleged violations of the invention and nondisclosure provisions in the severance agreement; trademark infringement; and damage award (or lack thereof) for breach of the nondisparagement provision in severance agreement. However, Kneebinding did not actually brief these arguments. Instead, Kneebinding explained that it was not able "to articulate its challenges" "due to the word count limitation imposed."  Instead, it requests "the Court's review of those questions sua sponte."  As the Court granted Kneebinding's motion for a word-count extension well above our normal word-count limit, see V.R.A.P. 32(a)(7), we conclude that it had sufficient space to be able to fully articulate its respective positions, and we decline to address these issues in the absence of adequate briefing.

¶ 25. In his cross-appeal, Howell raises numerous arguments, including that the trial court erred in dismissing his derivative claims of fraud in the inducement and breach of fiduciary duties. As a remedy, he requests rescission of the 2007 transaction agreement and damages.

¶ 26. We consider each party's respective claims in turn. In doing so, we review the trial court's factual findings for clear error. Creed v. Clogston, 2004 VT 34, ¶ 18, 176 Vt. 436, 852 A.2d 577. We will "uphold the court's factual findings unless, taking the evidence in the light most favorable to the prevailing party, and excluding the effect of the modifying evidence, there is no reasonable or credible evidence to support them." Id. Even where there is predominate countervailing evidence, the finding must stand unless the contrary proof is overwhelming. Brouha v. Postman, 145 Vt. 449, 451, 491 A.2d 1038, 1039 (1985); see also Knutsen v. Cegalis, 2011 VT 128, ¶ 13, 191 Vt. 546, 35 A.3d 1059 ("That a different weight or conclusion could be drawn from the same evidence may be grist for a disagreement, but does not show an abuse of discretion."). We will uphold the trial court's legal conclusions when they are "reasonably supported by the factual findings" and "the court has applied the correct legal standard." Luneau v. Peerless Ins., 170 Vt. 442, 444-45, 750 A.2d 1031, 1033 (2000). And "[w]e review the trial court's discretionary rulings for abuse of discretion." People's United Bank, NA v. Alana Provencale, Inc., 2018 VT 46, ¶ 8, __ Vt. __, 189 A.3d 71.

I. Kneebinding's and the Springer-Millers' Claims

A. Trial Court's Authority to Revise Findings and Conclusions in Interlocutory Orders Before Final Judgment

¶ 27. We reject Kneebinding's general claim that the trial court exceeded its discretion by revising its findings and conclusions on certain points in successive interlocutory decisions. As mentioned above, the trial court issued lengthy post-trial findings and conclusions in August 2016 that resolved some of the claims, but put off final judgment on others until the parties could present further evidence and argument. The court then held additional hearings and received additional briefing, ultimately releasing a series of decisions in early 2017 that resolved all claims and, in

11

some instances, articulated new findings and conclusions that arguably conflicted with those in the August 2016 decision.

¶ 28. Kneebinding challenges the trial court's ability to issue findings and conclusions in a decision, put off final judgment to allow the parties more time for briefing and evidence, and then issue a final decision with findings and conclusions that are at odds with the earlier decision. Citing the law-of-the-case doctrine, Kneebinding argues that the court was without discretion to revise the findings and conclusions from its August 2016 decision in subsequent interlocutory decisions absent "cogent and compelling reasons," such as "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." United States v. Quintieri, 306 F.3d 1217, 1230 (2d Cir. 2002) (quotations omitted). Kneebinding argues that in this case there was no intervening change of law, availability of new evidence, or need to correct a clear error or prevent manifest injustice, and thus, the court abused its discretion when it revised its findings and conclusions.

¶ 29. We disagree with Kneebinding that the law-of-the-case doctrine prohibited the trial court from revising its findings and conclusions because Vermont applies the doctrine liberally and the Vermont Rules of Civil Procedure allowed the court to revise its previous interlocutory orders prior to issuing its final judgment.

¶ 30. The law-of-the-case doctrine "applie[s] to the effect of previous orders on the later action of the court rendering them in the same case" and "expresses the practice of courts generally to refuse to reopen what has been decided." Perkins v. Vt. Hydro-Elec. Corp., 106 Vt. 367, 415, 177 A. 631, 653 (1934) (quotations omitted). It pertains to conclusions of law and questions of fact in the absence of new evidence, Coty v. Ramsey Assocs., Inc., 154 Vt. 168, 171, 573 A.2d 694, 696 (1990), in both criminal and civil proceedings. State v. Higgins, 156 Vt. 192, 193, 588 A.2d 1062, 1063 (1991). Generally, courts invoke the doctrine in two scenarios: (1) where a case is in front of the trial court on remand for re-adjudication after appellate review, Perkins, 106 Vt.

at 415, 177 A. at 653; and (2) where a trial court "reconsiders its own ruling on an issue in the absence of an intervening ruling on the issue by a higher court." Quintieri, 306 F.3d at 1225; see also Perkins, 106 Vt. at 415, 177 A. at 653 (noting that courts have applied law-of-the-case doctrine to "rulings of the trial court, not made subject to exception" and "where a certain theory of the law has been adopted upon the trial by the parties and the court").

¶ 31. In Vermont, however, the law-of-the-case doctrine normally does not bind the trial court. First, it is "a rule of practice from which the court may depart in a proper case" and courts have discretion "to reopen what has been decided" if required. Perkins, 106 Vt. at 415, 177 A. at 653 (quoting Messinger v. Anderson, 225 U.S. 436, 444 (1912)); see also In re A.M., 2015 VT 109, ¶ 56, 200 Vt. 189, 130 A.3d 211 (Dooley, J., concurring) (noting that law-of-the-case doctrine "is a rule of practice, rather than one of law, as a result the court has discretion to depart from it in the appropriate case"); State v. Cain, 126 Vt. 463, 469-70, 236 A.2d 501, 505 (1967) ("[T]he phrase 'law of the case' is essentially a rule of practice . . . . It rests for its absolute integrity upon sound public policy which does not permit the parties to go again and again to the Supreme Court upon the same question. But the power of the Court to depart from the rule, in a proper case, clearly exists.").[10]

¶ 32. Second, Vermont's Rules of Civil Procedure afford our courts significant flexibility to revise past rulings in subsequent interlocutory orders prior to the final judgment. Vermont Rule of Civil Procedure 54(b) provides that in cases where there are multiple claims for relief—whether that be a claim, counterclaim, cross-claim, or third-party claim—or multiple parties involved, in the absence of the court expressly entering a final judgment on fewer than all of the claims, "the order or other form of decision is subject to revision at any time before the entry of judgment

---

[10] This Court has taken a more limited view of the trial court's discretion to depart from the law of the case in instances where a case is back in front of the court on remand on a specific issue that does not require a new trial. See Higgins, 156 Vt. at 193, 588 A.2d at 1062-63 ("When a case is remanded, our decision is the law of that case on the points presented throughout all the subsequent proceedings." (quotation omitted)); Coty, 154 Vt. at 171, 573 A.2d at 696 (same).

adjudicating all the claims and the rights and liabilities of all the parties." As such, if the case properly falls within the ambit of Rule 54(b), the trial court has the discretion to reconsider and revise interlocutory rulings before issuing the final judgment. See Myers v. LaCasse, 2003 VT 86A, ¶ 11, 176 Vt. 29, 838 A.2d 50 ("The court [has] the discretion to modify an interlocutory order."); Putney School, Inc. v. Schaaf, 157 Vt. 396, 407, 599 A.2d 322, 328 (1991) (explaining that under Rule 54(b) trial court had "plenary power" to revise past interlocutory order "as justice requires" (quotations omitted)); see also Auto Serv. Co. v. KPMG, LLP, 537 F.3d 853, 856-57 (8th Cir. 2008) (upholding, pursuant to federal Rule 54(b), district court's "general discretionary authority to review and revise its interlocutory rulings prior to the entry of final judgment").

¶ 33. Trial courts often "could not operate justly" absent the power to reconsider previous rulings before the final judgment. 18B C. Wright & A. Miller, Federal Practice & Procedure: Jurisdiction & Related Matters § 4478.1 (2d ed. 2018). "Far too many things can go wrong, particularly with rulings made while the facts are still undeveloped or with decisions made under the pressures of time and docket." Id. Thus, Rule 54(b) affirms the court's "necessary authority" to monitor itself, uninhibited by the common law law-of-the-case rule. See id. ("Occasionally the undoubted power [under Rule 54(b)] to revise is reflected in statements that law-of-the-case principles do not apply to trial-court rulings. That view, badly expressed, may generate some confusion. Only if law-of-the-case rules are seen as constraints on authority is it helpful to say that the rules do not apply to reconsideration by a trial court." (footnotes omitted)).

¶ 34. We review the trial court's reconsideration of a past interlocutory order for abuse of discretion. Bostock v. City of Burlington, 2011 VT 89, ¶ 14, 190 Vt. 582, 30 A.3d 651; Myers, 2003 VT 86A, ¶ 11.

¶ 35. This case is multi-issue and multi-party, and the trial court had the discretion under Rule 54(b) to revise the findings and conclusions from its August 2016 decision. That decision was interlocutory rather than final in that it contemplated future action before the court could

resolve all issues. See Dudley v. Snyder, 140 Vt. 129, 131, 436 A.2d 763, 764 (1981) ("The judgment which was revised was not final. It contemplated future deeds, releases, and orders of dismissal."). The court did not actually issue its final judgment until the following May. In the meantime, it had the discretion to reevaluate the findings and conclusions from its previous interlocutory orders—a discretion that we conclude was not abused here. Accordingly, we evaluate the findings and conclusion for each claim below the way we would for any other case. See supra, ¶ 26.

## B. Enforcement of the First Contempt Order and the Permanent Injunction

¶ 36. The findings and analysis underlying the trial court's rulings declining to impose the $7000 contempt penalty pursuant to the March 2009 stipulated contempt order, terminating the permanent injunction, and declining to impose any monetary civil contempt provision are somewhat interrelated. Accordingly, we consider the trial court's orders impacting these various issues first, before considering each distinct issue on appeal.

## 1. The Trial Court's Orders

¶ 37. In its August 2016 order, the trial court concluded that the requirements of the March 2009 injunction did not raise "constitutional concerns" as to warrant an exception to the collateral bar rule for Howell's repeated violations of the injunction.[11] It accordingly considered evidence of Howell's violations of the order.

¶ 38. The court determined that Howell had violated paragraph one of the permanent injunction by disparaging Kneebinding and the Springer-Millers through internet posts and in person to Stowe community members from September 2009 through November 2015. Specifically, the court pointed to Howell's online statements that the Kneebinding bindings were "100% defective" and failed international safety standards, and that John Springer-Miller was a

---

[11] "The collateral bar rule provides that individuals cannot challenge the validity of a court order by violating the order." In re Duckman, 2006 VT 23, ¶ 10, 179 Vt. 467, 898 A.2d 734.

"spoiled brat" who had "wrongfully modified" Howell's design, "knowingly create[ed] fraudulent inducement" concerning the bindings, and committed a fraud on the court. The court also found that Howell violated the injunction in June 2009 when he referred to Tina and John Springer-Miller as "evil" when speaking to an acquaintance in a public store in Stowe. The court concluded, however, that Howell had not further violated the injunction by communicating with the Consumer Products Safety Commission concerning the bindings.

¶ 39. The court ruled that Howell had not violated paragraph two, prohibiting him from creating confusion as to whether he spoke or acted on behalf of Kneebinding, because his communications were not reasonably likely to create confusion about whether he spoke on behalf of Kneebinding, the Springer-Millers, or principals within the company. The record evidence, the court determined, indicated that it was clear to the audience that Howell was "emphatically speaking against" Kneebinding and the Springer-Millers, rather than "purporting to represent or speak for the Company or any of its principals in any way."

¶ 40. Likewise, the court found insufficient evidence that Howell had violated paragraph three of the injunction for failing to remove his past internet posts. Paragraph three reads:

> [Howell] shall forthwith remove, delete, or destroy, and to the extent not within his possession, custody or control, make his best efforts to remove, delete or destroy [any] communications within his possession, custody or control that fall within paragraphs 1 and 2 of this Order, including without limitation postings on EpicSki.com dated February 11, 2009, March 12, 2009, and March 16, 2009, and material at youtube.com . . . . Among other efforts, within 2 days of this Order, Mr. Howell shall send a letter or email to the appropriate administrators of the websites in question and any other websites to which he has posted, requesting that the material be taken down, with a copy to KneeBinding, Inc. via its counsel.

The court found that on April 2, 2009, Howell wrote to Kneebinding's attorneys regarding his efforts to remove the internet posts, with enclosed emails to, and responses from, the websites. Howell requested that Kneebinding respond by April 3 if it disagreed with these efforts. The court noted that "[a]lthough there was some testimony that some communications by [Howell] were still

16

available on certain websites, there is no evidence of a reply regarding dissatisfaction with [Howell's] efforts."

¶ 41. Having found Howell in contempt for violating the nondisparagement requirement in the permanent injunction, the court called for further briefing as to the appropriate sanction for past violations and for appropriate equitable remedies to discourage such behavior in the future.

¶ 42. With respect to the March 2009 stipulated contempt order that assigned a sanction of $7000 for Howell's contempt with respect to the TRO but provided that the sanctions would be waived if Howell did not violate the permanent injunction before September 15, 2009, the trial court concluded that Howell had violated this agreement and order in two ways. Both of the violations identified by the trial court were tied to the requirements of an April 2009 letter agreement between the parties that included a provision stipulating that violation of the agreement would be tantamount to violation of the March 2009 injunction. The agreement required Howell to contact an organization to whom he had sent an abstract to request that it not publish or disseminate the abstract, and to provide evidence of having done so by April 17, 2009. It also required Howell to cease and desist from making any statements of any kind about Kneebinding to anyone, including anyone in the scientific, business, or lay community.

¶ 43. The court found that Howell had violated these requirements by contacting the ski-safety organization on April 21, 2009 to request that they not publish his abstract—four days beyond the April 17 date agreed upon in the April 2009 letter agreement. In addition, in the corresponding email to that organization Howell disparaged "[t]he investor who squeezed [him] out of the company that [he] formed, Kneebinding, Inc.," and said that he would "continue to fight this unsafe court order" against him. (Alterations in original.) The court found that this communication violated the nondisparagement requirement in the April 2009 letter agreement. The court explained that this behavior before September 15, 2009 "revive[d] the potential that the

17

[$7000] fine in the Stipulation Regarding Contempt may be imposed." It invited the parties to brief the question for hearing and argument.

¶ 44. In its February 2017 decision, the court declined to impose the $7000 fine. The court acknowledged that Howell sent the April 21 email seeking to withdraw his abstract from the International Society for Skiing Safety four days late. However, the court concluded that Howell did not in fact violate the nondisparagement requirement in the April 2009 letter agreement because the disparaging content in the email referred to John Springer-Miller rather than Kneebinding and it was sent to an international ski-safety organization rather than a potential client, investor, or vendor. The court also noted that it had previously concluded that Howell had violated paragraph one of the injunction from March 31 through September 15, 2009—thus raising the potential for the $7000 fine—by telling a Stowe community member in June 2009 that John and Tina Springer-Miller were evil. But the court did not apply the sanction on this basis because Kneebinding "offer[ed] [no] evidence that [the community member] was a 'current or potential customer, client, investor, or vendor.' " Accordingly, the court determined that the only basis for imposing the $7000 fine would be Howell's tardiness in sending the email seeking to withdraw the abstract. The court declined to apply the sanction on this basis.

¶ 45. In its March 2017 decision on contempt sanctions, the court prospectively vacated the permanent injunction and declined to impose contempt sanctions for any violations while the injunction was in effect. With respect to the continuing force of the injunction, the court began by explaining that "[d]espite the term 'permanent injunction,' " it had "consistently taken the position that the [injunction] is a preliminary injunction, intended to last until the conclusion of this case at the trial level, at which time it would be reviewed, then to be extended, amended, or terminated, as justified by the evidence and the applicable law." "Except for the word 'permanent,' " the court noted, "the stipulation did not otherwise make it clear that the question of an injunction was off the table for the entire future." The court found it significant that Kneebinding, in its post-trial

18

briefing, requested an addendum to the injunction that would prevent Howell from "permanently and completely . . . participating in ANY exchange of information relating to KneeBinding," or from owning, purchasing, testing, mounting, modifying, handling, or skiing upon a Kneebinding ski binding. This proposed addendum, the court concluded, would "make it practically impossible for [Howell] to live in Stowe and communicate with anyone, especially if they were in any way connected with the ski industry."

¶ 46. In addition to the language of the injunction and the scope of Kneebinding's proposed addendum, the court expressed concern that continuing the injunction would infringe Howell's First Amendment rights. "Injunctions against any speech, even libel," the court explained, "constitute prior restraints and are disfavored." Accordingly, the court ruled that the injunction would have no prospective effect.

¶ 47. With respect to the proposed sanctions for Howell's contempt (other than the potential $7000 penalty established in the March 2009 order regarding contempt that the trial court had declined to impose), the court explained:

> [T]he court has reconsidered its rulings and the potential remedies. In 2010 and later, Mr. Howell did clearly ignore the injunction and made derogatory and even defamatory statements in blogs, written communications, and in statements to third parties. Although [Kneebinding] and its ski bindings are prominently mentioned, the primary focus of Mr. Howell's communications was John Springer-Miller, who was mentioned either directly or by clear implication. The question here is what might be the appropriate sanction for what is obviously a clear disregard of the injunction.

¶ 48. Ultimately, the court declined to impose sanctions for Howell's "clear disregard of the injunction." The court explained that since it had vacated the injunction, any nonpurgeable fine would have been "prospective, rather than coercive," and this case did not present "extreme and extraordinary circumstances" to warrant a "purely prospective fine." And the court concluded that a compensatory fine was not necessary, as "[n]o actual loss or other monetary damages have been proved." Nor, the court determined, were punitive damages appropriate because "in this case,

19

any animosity, ill will, or malicious intent in what was posted, written, or said to third parties, was almost exclusively directed at one person, John Springer-Miller," rather than Kneebinding as an entity—"although [Kneebinding] inevitably would have had some damage to its reputation."

¶ 49. On appeal, Kneebinding challenges the trial court's failure to impose the $7000 sanction provided for in the March 2009 stipulated order concerning contempt, its decision to vacate the permanent injunction, and its decision to not impose any sanctions for Howell's repeated violations of the March 2009 stipulated permanent injunction. We consider each challenge in turn.

2. The $7000 Sanction in the March 2009 Stipulated Contempt Order

¶ 50. Kneebinding challenges the trial court's refusal to impose the $7000 contempt sanction embodied in the March 2009 stipulated contempt order on two bases. It argues that (1) the court's February 2017 decision that Howell did not violate the nondisparagement provision in the April 2009 letter agreement ignored the court's previous findings in its August 2016 decision that Howell had violated that agreement, and thus the court's injunction; and (2) the court erroneously reversed its August 2016 finding that Howell telling a Stowe community member in June 2009 that the Springer-Millers were "evil" violated paragraph one of the injunction and thus triggered the fine in the stipulation and order regarding contempt.

¶ 51. We conclude that the evidence and the trial court's own findings leave no discretion for the trial court to decline to impose the $7000 fine. The court's March 2009 stipulated contempt order was based on a stipulated finding that Howell posted to a blog and picketed at the Lamoille Courthouse in knowing and deliberate violation of the court's temporary restraining order, and was accordingly in contempt. The stipulated sanction for the contempt was a $7000 fine. However, Howell was relieved of the obligation to pay the fine "if he does not further violate the Temporary Restraining Order or the permanent injunction prior to September 15, 2009." The court's own findings concerning Howell's conduct reflect at least two substantial violations of the permanent injunction between the time of that order and September 15, in addition to the court's

20

finding that Howell was tardy in contacting the ski-safety organization to withdraw his abstract. The court's rationale for not crediting each of those violations does not square with the terms of the injunction.

¶ 52. One violation arises from the court's finding that, in his email to that ski-safety organization, Howell wrote:

> Hello fellow skiing-safety colleagues. The investor who squeezed me out of the company that I founded, KneeBinding, Inc., has now caused a court-order to be issued blocking me from submitting my previously-submitted proposal for optional standards regarding lateral heel release settings in bindings that offer lateral heel release (which proper lateral heel release will mitigate Phantom Foot knee injuries).

Howell further stated that he would "continue to fight this unsafe court order." The court concluded that this violation did not in fact trigger enforcement of the $7000 fine because the disparaging remark referred to John Springer-Miller, not Kneebinding, and accordingly did not run afoul of the April 2009 letter agreement that Kneebinding relied upon. This explanation fails for at least two reasons.

¶ 53. First, regardless of the terms of the April 2009 letter agreement that the court treated as auxiliary to the March 2009 permanent injunction, the permanent injunction itself specifically provided, "Howell shall not publish or cause to be published any communication, oral or written, that relates to KneeBinding, its products, or John or Tina Springer-Miller or any of its principals to any current or potential consumer, client, investor or vendor." This restriction expressly includes statements about John Springer-Miller. The trial court's suggestion that individuals at a ski-safety organization are not included within the scope of the restriction in the March 2009 injunction because they are not necessarily potential consumers, clients, investors, or vendors relies on an unduly narrow reading of the restriction. If this individual who is so involved in skiing and the ski industry that he is part of a ski-safety organization is not by inference a potential consumer, it is hard to imagine who is.

21

¶ 54. Second, the court's suggestion that Howell's statement did not violate the letter agreement or injunction because it referenced only John Springer-Miller, and not Kneebinding, reflects an unsupportable interpretation of the statement. In the context of a statement about optional safety standards for lateral-heel-release settings in bindings that offer lateral heel release (namely, Kneebinding's), Howell indicated that he was fighting an "unsafe court order." The clear implication of this statement was that Kneebinding's product had safety issues. Given these considerations, the trial court's failure to credit this violation of the March 2009 injunction order is not supported.

¶ 55. The other violation arises from the trial court's finding in its August 2016 order that in June 2009 Howell called John and Tina Springer-Miller "evil" in a conversation with an acquaintance in a public store in Stowe, Vermont. The court found that this conversation violated paragraph one of the injunction. In its February 2017 decision declining to impose the $7000 fine, the trial court maintained this factual finding but revisited its conclusion. Because Kneebinding did not offer evidence that the acquaintance was a "current or potential customer, client, investor or vendor," the court concluded that Howell's disparaging statements did not run afoul of the March 2009 injunction to support imposition of the $7000 fine. This conclusion reflects an overly narrow understanding of the scope of the restriction in paragraph one, a misapprehension of the evidence, or both.

¶ 56. The individual to whom Howell made the offending remarks testified that he owned a ski shop from 1984 through 1994, and this shop sold bindings. That is more than enough to support the inference that he is a potential customer; he need not specifically testify that he is considering buying Kneebinding bindings or doing business with the company. The whole point of the injunction is to give teeth to the nondisparagement provision in the parties' severance agreement, thereby protecting Kneebinding against disparagement that undermines its ability to grow and prosper. The suggestion that someone who lives in Stowe, Vermont who owned a ski

22

shop for years is not within the universe of potential customers, clients, investors, or vendors identified in the permanent injunction is inconsistent with the letter and spirit of the permanent injunction.

### 3. Terminating the Injunction

¶ 57.    Kneebinding challenges the court's decision to terminate the injunction, arguing that the court had no basis to conclude in its March 2017 decision that the injunction was really meant to be temporary and was, in any event, likely unconstitutional. Kneebinding challenges the court's conclusion that its proposed addendum to the injunction signaled that the injunction was not intended to be permanent, and argues that a court's enforcement of private contractual arrangements that limit speech does not implicate the First Amendment.

¶ 58.    We agree with Kneebinding on both points and reverse the trial court's decision to vacate the permanent injunction because we conclude that, based on the plain language of their stipulation, the parties intended for the injunction to be permanent. Although the court is not bound to incorporate the parties' stipulation into a court order, its discretion on this point is not unlimited. The trial court's partial rationale for vacating the injunction—resting on concerns about the constitutional implications of the permanent injunction—was baseless because private parties may enter agreements that waive their respective free speech rights, and courts may enforce those agreements, without running afoul of the First Amendment. Accordingly, the court exceeded its discretion in terminating the injunction.

¶ 59.    The plain language of the injunction demonstrates that the parties and court intended for it to be permanent. "When the plain language of the writing is unambiguous, we take the words to represent the parties' intent, and the plain meaning of the language governs our interpretation of the contract." Southwick v. City of Rutland, 2011 VT 105, ¶ 5, 190 Vt. 324, 30 A.3d 1298 (citation omitted); see also In re Verderber, 173 Vt. 612, 615, 795 A.2d 1157, 1161 (2002) ("[W]hen the language of the contract is clear on its face, we will assume that the intent of

23

the parties is embedded in its terms."). The agreement—which Howell negotiated and signed while represented by counsel—and the ensuing court order state that Howell "agrees to the entry of a permanent injunction." Notably, the parties' stipulated order regarding Howell's contempt of the TRO, executed on the same day as the stipulated injunction, states that he will not have to pay the agreed upon sanction as long as he does not further violate "the permanent injunction." The language in the stipulations is unambiguous: it spells out that the injunction is permanent. That Kneebinding, during the litigation, proposed an addendum to the injunction—which the court was free to and did reject—does not alter the permanence of the original agreement.

¶ 60.   We recognize that the parties' clear intent that the court order a permanent injunction does not necessarily obligate the court to issue a permanent injunction pursuant to the parties' agreement. See Midland Funding, LLC v. Tripp, 38 A.3d 221, 224 (Conn. App. Ct. 2012) ("The parties cannot . . . compel a court to render a judgment in accordance with a stipulation that the court, in the exercise of its discretion, is unwilling to accept"). But the court's discretion to decline to approve a stipulation executed by two sophisticated parties represented by counsel is limited. See id. ("Ordinarily . . . stipulations of the parties should be adopted by the court. If, for some reason, [however] the court cannot adopt the stipulation of the parties, it should state its disapproval of the stipulation and the reasons for its disapproval on the record." (quotation omitted)). The court's rationale in this case for vacating the stipulated-to injunction—that it was concerned about the First Amendment implications of restraining Howell's speech—was grounded in a misapprehension of the law.

¶ 61.   The court's conclusion that the injunction is an unconstitutional prior restraint on speech was in error. Private parties are free to contractually waive their First Amendment rights. See Cohen v. Cowles Media Co., 501 U.S. 663, 670-71 (1991) (holding that private parties can enter agreements to restrict speech without implicating First Amendment); Perricone v. Perricone, 972 A.2d 666, 677 (Conn. 2009) (explaining that "private parties who voluntarily enter into an

agreement to restrict their own speech thereby waive their first amendment rights"); Messina v. Iowa Dep't of Job Serv., 341 N.W.2d 52, 60 (Iowa 1983) ("Courts, upon proper showing, recognize the concept of contractual waiver of constitutional rights in civil cases."); Verizon New England, Inc. v. Pub. Utils. Comm'n, 2005 ME 16, ¶ 14, 866 A.2d 844 ("It is well settled that a party may waive its constitutional rights . . . . "); cf. Katz v. S. Burlington Sch. Dist., 2009 VT 6, ¶ 9, 185 Vt. 621, 970 A.2d 1226 (mem.) (explaining that nondisparagement agreements "may be subject to implied exceptions for public policy purposes" but are not "categorially void").

¶ 62.    And if the waiver was knowing, voluntary, clear, and unequivocal, state action through judicial recognition and enforcement of the agreement is constitutional.  See Lake James Cmty. Volunteer Fire Dep't, Inc. v. Burke Cty., N.C., 149 F.3d 277, 280 (4th Cir. 1998) (explaining that if contractual waiver of constitutional right is knowing, voluntary, and does not undermine public interest, "courts have routinely enforced voluntary agreements" that waive free speech rights); Pierce v. St. Vrain Valley Sch. Dist., RE-1J, 981 P.2d 600, 604 (Colo. 1999) (en banc) ("Enforcement of the settlement agreement does not violate the First Amendment, but merely applies the law of contract in Colorado, which simply requires those making promises to keep them." (quotation omitted)).  As the Connecticut Supreme Court has explained:

> [W]hen private parties—and not the government—voluntarily have defined the scope of the disclosures that would trigger sanctions, the parties cannot complain if the court merely holds them to their promises.  Accordingly, we conclude that a party's contractual waiver of the first amendment's prohibition on prior restraints on speech constitutionally may be enforced by the courts even if the contract is not narrowly tailored to advance a compelling state interest.

Perricone, 972 A.2d at 679 (footnote and quotation omitted).

¶ 63.    Because the record evidence demonstrates that the stipulation providing for the injunction was voluntarily agreed to after day-long negotiations—with counsel representing both parties—and it clearly identifies the free speech rights that Howell is relinquishing, the continued validity of the agreement—and judicial enforcement thereof—does not raise constitutional flags.

¶ 64.    Because the trial court's decision vacating the stipulated-to permanent injunction was based on an erroneous understanding of the law, the court's order on this point exceeded its discretion. The portion of the trial court's final judgment vacating the March 30, 2009 permanent injunction is reversed.[12]

### 4.  Denial of Contempt Sanctions

¶ 65.    Kneebinding challenges the trial court's decision to not impose any monetary sanctions for civil contempt on several bases. It argues that the court erred in concluding that Howell had not violated paragraphs two and three of the permanent injunction, and that it abused its discretion in declining to impose sanctions. We reject Kneebinding's arguments on both points.

### a.  Findings Concerning Paragraphs Two and Three

¶ 66.    Paragraph two of the permanent injunction forbids Howell from publishing or making statements reasonably likely "to create confusion as to whether he speaks or acts on behalf of Kneebinding, its products, or John or Tina Springer-Miller, or any of its other principals." Paragraph three requires Howell to destroy or arrange for the destruction of existing disparaging communications, specifically identifying various web postings for him to remove.

¶ 67.    Kneebinding argues that the court erred in concluding that Howell had not violated these requirements when the evidence establishes that (1) Howell published communications from 2009 through 2015 that created reasonable confusion about whether he spoke on behalf of the company; and (2) he had not made efforts to remove these posts. In support of its argument, Kneebinding points to evidence of Howell's (1) Linkedin.com page from 2015 stating that he was President and CEO of Kneebinding, and that he invented the company's IP, developed its product,

---

[12]  Howell also argues that, under a public policy exception to the collateral bar rule, he cannot be held in contempt of the injunction because he was trying to warn the public about a dangerous product. This argument is unavailing. The injunction limits Howell's ability to speak about Kneebinding or the Springer-Millers to any current or potential consumer, client, investor, or vendor. However, by its plain terms, the injunction does not limit Howell from going to a governmental investigative body—as he has previously—with a complaint if he has concerns.

and founded the company; (2) online posts representing that Howell was the "company founder, the prime developer, and a significant shareholder of Kneebinding"; and (3) a letter to Kneebinding's plastic vendor in 2015 stating that he was the "100% owner of KneeBinding, Inc." and that it "must immediately cease and desist from making, using, selling and/or inducing others to sell all such products," which caused the plastics vendor to halt production for several days to receive confirmation from Kneebinding that production could proceed.

¶ 68. The plaintiff bears the burden of proving the elements of civil contempt by clear and convincing evidence. Vt. Women's Health Ctr. v. Operation Rescue, 159 Vt. 141, 146, 617 A.2d 411, 414 (1992). "Once the trial court has made its findings of fact . . . we will not disturb the judgment unless the court's discretion was entirely withheld or was exercised on grounds clearly untenable." Id. at 146-47, 617 A.2d at 414 (quotation omitted).

¶ 69. We conclude that the trial court's findings are supported by the evidence and within the trial court's discretion. The trial court could reasonably conclude that neither Howell's Linkedin.com page, nor his online statements that he was the company founder and a current, significant minority shareholder, were reasonably likely to create confusion about whether he represents the company. Howell's Linkedin.com page stated that he was President and CEO of Kneebinding from 2003 through 2008. This statement is true and reflected his past leadership role in the company; it was logical for the court to infer that a reasonable person reading the page would not conclude that Howell currently speaks or acts on behalf of the company. His online statements that he was a company founder and a current minority shareholder are also true, and the court could reasonably conclude that these comments also would not necessarily make a reasonable person think the Howell speaks on behalf of the company today. Rather, they speak to Howell's history and current minority stake in the company. Moreover, the court reasonably concluded that the substance of Howell's communications, which were "emphatically" against Kneebinding and the Springer-Millers, made it clear that he was not purporting to speak for the company and its

27

principles in any way. Based on this evidence, we cannot say that the trial court's findings that the posts did not violate the second paragraph of the permanent injunction were clearly erroneous, or that the court abused its discretion in not ordering contempt sanctions on this basis.

¶ 70. We likewise uphold the trial court's conclusion that Howell did not violate paragraph two in sending the cease-and-desist order to Kneebinding's plastics vendor. Trial testimony from an officer with the vendor shows that it took the letter seriously as a threat of litigation and stopped production for a "couple of days" so that it could confer with Kneebinding. Emails from the vendor to Kneebinding during this time demonstrate that the letter made the vendor "a little nervous," but also that it knew Howell had "no authority to order a [cease and desist]" and just "wanted to get a rise from folks." John Springer-Miller's reply email assured the vendor that it could "completely ignore" the letter. The court's conclusion that this letter was not reasonably likely to make the vendor believe that Howell spoke on behalf of the company is supported by evidence that the vendor did not believe that Howell spoke on behalf of the company but, rather, was concerned about the potential for litigation the letter posed.

¶ 71. Finally, the trial court's findings as to Howell's compliance with paragraph three of the permanent injunction are supported by the evidence. As noted above, paragraph three required Howell to make efforts to remove certain postings from the internet and to notify Kneebinding's counsel of these efforts. In early April 2009, Howell's counsel wrote Kneebinding's lawyer regarding Howell's efforts to remove the communications in compliance with the requirements of paragraph three, enclosing Howell's emails and related responses. He asserted that Howell had taken all reasonable steps to comply with the stipulation and order as of March 30 and requested a response if Kneebinding disagreed. The court noted that Kneebinding never replied to express dissatisfaction. The court noted that some communications by Howell were still available on certain websites, but concluded that there was insufficient evidence that Howell's efforts were inadequate to support a finding that he had violated the requirements of

28

paragraph three. In concluding that the trial court's determination is supported by the record, we note that (1) the question pursuant to paragraph three is whether Howell made his best efforts to delete communications not within his control, and not whether offending postings remain available online,[13] and (2) Kneebinding bears the burden of proof on this question. Based on these considerations, we conclude that the trial court's conclusion is not clearly erroneous.

b. Denial of Contempt Sanctions

¶ 72. In addition to challenging the trial court's findings in connection with their motion for contempt sanctions, Kneebinding challenges the trial court's exercise of discretion in declining to impose a monetary sanction for civil contempt. It argues that the court erred in concluding that: (1) a civil contempt fine was not appropriate; and (2) Howell's postings had been mostly directed at Springer-Miller, rather than Kneebinding. We conclude that the trial court's decision to not impose any monetary civil contempt sanctions was within its discretion.

¶ 73. Civil contempt sanctions may be used as a coercive measure to compel future compliance with a court order, Sheehan v. Ryea, 171 Vt. 511, 512, 757 A.2d 467, 468 (2000) (mem.), or to compensate the victim. See, e.g., United States v. United Mine Workers of Am., 330 U.S. 258, 303–04 (1947) ("Judicial sanctions in civil contempt proceedings may, in a proper case, be employed for either or both of two purposes[:] to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained."). Our courts do not use civil contempt sanctions to punish the offending party. Sheehan, 171 Vt. at 512, 757 A.2d at 468.

---

[13] To the extent that Howell posted new communications after this order, those postings violated paragraph one of the permanent injunction. Such postings are encompassed within the court's finding that "[b]etween September 15, 2009 and November 2015, there were numerous negative communications generated by Mr. Howell pertaining to KneeBinding, Inc. or its principles" including a post on a public site referring to Kneebinding's bindings as "100% defective" and having failed international safety standards.

¶ 74.    Purely prospective contempt fines are disfavored in Vermont,[14] but, as noted, a court may impose fines in the appropriate case to compensate the victim or as a coercive sanction. Mann v. Levin, 2004 VT 10, ¶ 32, 177 Vt. 261, 861 A.2d 1138; Vt. Women's Health Ctr., 159 Vt. at 151, 617 A.2d at 417.  Prospective coercive sanctions should be levied only under "extreme and extraordinary" circumstances.  State v. Gundlah ex rel. Smallheer, 160 Vt. 193, 197, 624 A.2d 368, 369 (1993) (quotation omitted); see also Vt. Women's Health Ctr., 159 Vt. at 152, 617 A.2d at 417 (holding that because circumstances were "extreme and extraordinary" prospective coercive fines were appropriate).  A coercive sanction must be purgeable—that is, it must be "capable of being avoided by defendant's adherence to the court's order."  Vt. Women's Health Ctr., 159 Vt. at 151, 617 A.2d at 417; see also Sheehan, 171 Vt. at 512, 757 A.2d at 512 ("[O]nly compensatory fines or coercive sanctions may be imposed on a civil contemnor, and these must be purgeable, i.e., they must be capable of being avoided by defendants through adherence to the court's order." (alteration in original) (quotation omitted)).  And "the situation must be such that it is easy to gauge the compliance or noncompliance with an order."  Vt. Women's Health Ctr., 159 Vt. at 151, 617 A.2d at 417 (quotation omitted).

¶ 75.    We affirm the court's exercise of discretion not to impose a compensatory contempt fine because Kneebinding did not demonstrate an actual loss or other monetary damages as a result of Howell's violation of paragraph one, other than attorney's fees, which the court addressed in a separate decision, discussed below.  See Nettis Envtl. Ltd. v. IWI, Inc., 46 F. Supp. 2d 722, 728 (N.D. Ohio 1999) (explaining that "[t]o be entitled to a compensatory fine, [plaintiff] must introduce evidence showing actual loss"); Boca Raton Towing, Inc. v. Boca Raton Towing & Recovery, Inc., 729 So. 2d 531, 531 (Fla. Dist. Ct. App. 1999) ("[I]f the fine is compensatory in nature, the amount must reasonably relate to the complainant's losses as shown by the record.").

---

[14]    "A purely prospective fine can be defined as a purgeable penalty imposed on a contemnor who is currently in compliance with the underlying court order."  State v. Pownal Tanning Co., 142 Vt. 601, 606, 459 A.2d 989, 992 (1983).

¶ 76. We likewise conclude that the court's denial of prospective coercive sanctions fell within the court's broad discretion. As noted above, prospective coercive sanctions should be levied only under "extreme and extraordinary" circumstances. Gundlah ex rel. Smallheer, 160 Vt. at 197, 624 A.2d at 369 (quotation omitted). The trial court acknowledged Howell's myriad violations of the permanent injunction, including posting a statement on a public website referring to Kneebinding's bindings as "100% defective" and asserting that they had failed international safety standards. The court recognized that Howell was in contempt. But the court concluded that these were not sufficiently "extreme and extraordinary" circumstances to justify a purely prospective fine for civil contempt. The court was well aware of the various violations it had identified, but concluded they did not satisfy the high standard for prospective coercive sanctions.[15] Its discretionary determination that Howell's violations of paragraph one did not meet this standard is entitled to considerable deference. Id. at 196, 624 A.2d at 370.[16] Nothing in our analysis precludes Kneebinding from seeking further relief in the form of contempt sanctions if Howell's contemptuous conduct continues.

---

[15] The court also pointed to its termination of the permanent injunction as a reason not to impose a coercive, purgeable fine. Because we reverse the court's termination of the injunction, we do not address that alternate rationale.

[16] In challenging the court's refusal to impose civil contempt sanctions, Kneebinding also claims error in the court's reasoning that the injunction was issued in favor of Kneebinding, yet Howell's animosity, ill will, and malicious intent was directed almost exclusively at John Springer-Miller. In its March 2017 order on the contempt sanctions, the court made this point in its discussion rejecting a punitive contempt sanction. Kneebinding does not argue on appeal that the court should have awarded punitive damages for civil contempt, nor could it: civil contempt sanctions are never used to punish the offender. Sheehan, 171 Vt. at 512, 757 A.2d at 468; see also In re C.W., 169 Vt. 512, 516, 739 A.2d 1236, 1239 (1999) ("The purpose of a criminal contempt proceeding is punitive, and the purpose of a civil contempt proceeding is coercive."). Nor does Kneebinding challenge the court's conclusion that a monetary fine for criminal contempt was inappropriate here. Among other things, the procedural requirements of Vermont Rule of Criminal Procedure 42 for criminal contempt orders were not satisfied. Because the court's observation about the focus of Howell's ire was not germane to its analysis of civil contempt sanctions, we decline to address Kneebinding's challenge here.

## C. Compensatory and Punitive Damages for Defamation

¶ 77. In its August 2016 decision, the trial court concluded that Howell's numerous internet posts stating that Kneebinding ski bindings were defective and dangerous were false[17] and defamatory, and that "there must have been some damage to the Company's reputation, and maybe even to sales, as a result of [Howell's] libelous statements." The court concluded that Howell's use of the defects against the company, its product, and its management "was clearly based on spite and retaliation," and that he wrote the statements to harm Kneebinding's reputation. The court delayed awarding damages so that Kneebinding could present further evidence.

¶ 78. In a subsequent opinion released in January 2017, the court explained that there was "sufficient credible evidence in the record to support[,] at the least, temporary injury" to the company's reputation, warranting a general damage award. Furthermore, the court found that Howell acted with "ill will and insult," justifying "some reasonable level of punitive damages."

---

[17] The court concluded that Kneebinding experienced some problems with the production run its first year—including issues with its anti-friction device, calibration numbers, and ski brakes, and that, in some instances, the binding was hard to step into. The court noted, however, that these defects were unlikely to cause serious injury or death and that, in any event, the company had fixed the problems by its second production run, with no injuries reported. The court thus explained that it could not "agree that the bindings were anywhere near '100% defective' or likely to cause bodily injury or death, as Howell has claimed." "In view of the limited production and sales the first year, and the prompt remedies taken in the second production run," the court explained, "Howell's statements to the public and other individuals were wide of the mark."

Howell challenges the court's findings and conclusions on this point, reiterating that from 2009 through 2014, the bindings were defective and dangerous. The trial court's conclusions in this regard were supported by its findings, which were supported by the evidence. During trial, the court heard testimony from: a ski engineer about amendments to the binding after the initial production run and the satisfactory results of safety tests conducted on the 2014-15 version of the binding; multiple ski shop managers, who attested to the binding's safety, and one who noted that, while there were some initial problems with the binding, his store had not had a warranty claim since 2010; and John Springer-Miller, who explained the company's safety testing policy, that as of 2009 the binding complied with international testing standards, and that the company resolved its early problems with the anti-friction device and other issues. The court's conclusion is further buttressed by the federal Consumer Product Safety Commission's investigation's conclusion in 2010 that the bindings were safe.

But, before deciding on the specific amount of both general and punitive damages, the court directed the parties to submit still further memoranda.

¶ 79. The court issued its final decision on defamation damages in March 2017. It began by examining Kneebinding's claims for compensatory damages and found that Kneebinding had not shown evidence of financial injury, or any other injury, beyond that which was merely "temporary." The court explained that while "it is alleged, and it may be true, that Mr. Howell's claims were made known to the experts and other influential writers and thinkers in the ski industry," there was no evidence that the ski industry took his claims seriously, which called the impact of the postings into question. If anything, the court noted, the evidence indicates that the binding has only increased in popularity in recent years. Nevertheless, the court concluded that Kneebinding had presented enough "proof of damage to justify a modest award" of $3500 in compensatory damages.

¶ 80. The court next explained that it had reconsidered its previous conclusion that this case merits punitive damages. As in its March 2017 decision regarding contempt sanctions, the court concluded that " 'any animosity, ill will, or malicious intent' [was] overwhelmingly directed at John Springer-Miller, rather than [Kneebinding]," and therefore "any malice exhibited by Mr. Howell was directed at Mr. Springer-Miller and not [Kneebinding], the named plaintiff." The court declined to consider Howell's communications concerning John Springer-Miller in determining the damages warranted on behalf of Kneebinding. Noting that there was no evidence, or even an implication, that Howell had any assets worthy of note, as well as his lack of malice against Kneebinding, the court concluded that punitive damages were not justified.

¶ 81. Kneebinding now challenges the final judgment award (or lack thereof) for general and punitive damages. First, it argues that although "[t]he amount of compensatory damages in a defamation action is ordinarily a question for the fact finder," the $3500 award here "represents a flagrantly small sum." Kneebinding contends that the damage to its reputation from internet posts

33

that will exist for an indefinite duration was ignored by a trial court "myopically concerned with documentary evidence of actual financial loss." Second, Kneebinding argues that the court's final analysis of punitive damages in its March 2017 decision was "flagrantly at odds" with its previous findings and conclusion that Howell had indeed acted with malice toward Kneebinding, and, absent "cogent" and "compelling" reasons, the court abused its discretion in reversing these previous findings and conclusions.[18] We disagree.

## 1. Compensatory Damages

¶ 82. We conclude that the trial court's compensatory damage award, while admittedly quite low, is within the trial court's broad discretion in light of the absence of any evidence of economic harm to Kneebinding as a result of Howell's defamation. Defamation entails:

> (1) a false and defamatory statement concerning [the plaintiff]; (2) some negligence, or greater fault, in publishing the statement; (3) publication to a least one third person; (4) lack of privilege in the publication; (5) special damages, unless actionable per se; and (6) some actual harm [to the plaintiff] so as to warrant compensatory damages.

Skaskiw v. Vt. Agency of Agric., 2014 VT 133, ¶ 8, 198 Vt. 187, 112 A.3d 1277 (alteration in original) (quotation omitted).

¶ 83. Libel—the written form of defamation—is actionable per se. That is, "the plaintiff need not allege nor prove that he or she suffered any 'special damages' as a direct or proximate result of the libel." Lent v. Huntoon, 143 Vt. 539, 545-46, 470 A.2d 1162, 1167 (1983). Special damages, which are damages of a pecuniary nature—including loss of customers, loss of business, loss of contract, or loss of employment—are presumed. Id. However, even in a case (such as libel) that is actionable per se and special damages are presumed, the plaintiff must still show some

---

[18] Kneebinding focuses its argument on the evidentiary basis for the trial court's finding on this point, and does not challenge the trial court's implicit legal assumption that Kneebinding could not recover punitive damages for libelous statements against the company, made with malice, if the ill will that underlay that malice was directed at a third party—namely, John Spring-Miller. For the purposes of this appeal only, we accept that unchallenged premise without considering or ruling on its validity.

actual harm to recover general, compensatory damages. Id. at 549, 470 A.2d at 1169-70. Evidence of embarrassment or temporary damage to reputation is sufficient to show actual harm. Cooper v. Myer, 2007 VT 131, ¶ 9, 183 Vt. 561, 944 A.2d 915; see also Wood v. Wood, 166 Vt. 608, 609, 693 A.2d 673, 674 (1997) ("We have also recognized that proof of embarrassment and temporary injury to reputation would be sufficient to support an award of general damages." (quotation omitted)). The plaintiff bears the burden to plead and prove these damages. Ryan v. Herald Ass'n, 152 Vt. 275, 281-82, 566 A.2d 1316, 1318-20 (1989).

¶ 84. In general, the calculation and award of compensatory damages is within the discretion of the fact finder and the award "must stand unless grossly excessive." Post & Beam Equities Grp., LLC v. Sunne Vill. Dev. Prop. Owners Ass'n, 2015 VT 60, ¶ 16, 199 Vt. 313, 124 A.3d 454 (quotation omitted).

¶ 85. Here, the evidence fails to establish that the $3500 general damage award was an abuse of discretion. Kneebinding did not show actual economic damage from Howell's defamatory behavior. And while the court safely assumed that Kneebinding suffered some reputational damage, supporting its award of general damages, there is nothing in the record that compels the trial court to conclude that this reputational damage was anything more than nominal. Kneebinding reasonably argues that the disparaging posts remain on the internet to be seen by all through simple searches, and that this reality supports an inference of substantial reputational damage and a correspondingly substantial award of general damages. But the trial court fairly notes that Kneebinding's business has only grown, and there is no evidence that the potential harm arising from the offending posts has actually come to pass. This is precisely the type of murky calculation best left to the finder of fact. See Wood, 166 Vt. at 609, 693 A.2d at 673 (holding that complainant "adduced no credible evidence of actual harm" in defamation suit because evidence consisted of mere statement that plaintiff was " '100 percent sure [he had] lost a lot of customers' "

and "that his reputation had been injured and that he had lost sales" (alteration in original)). We therefore affirm the trial court's award regarding general, compensatory defamation damages.

## 2. Punitive Damages

¶ 86.    The trial court did not abuse its discretion in denying punitive damages. Its conclusion that most of Howell's ire was directed at the Springer-Millers and not Kneebinding itself was supportable on the record, and, in any event, the court's decision not to impose punitive damages in the absence of evidence about Howell's finances is consistent with our law.

¶ 87.    Once a plaintiff establishes general damages in a defamation suit, he or she may seek punitive damages if the defendant acted with malice. See, e.g., Lent, 143 Vt. at 550, 470 A.2d at 1170. "[Malice] may be shown by conduct manifesting personal ill will or carried out under circumstances evidencing insult or oppression, or even by conduct showing a reckless or wanton disregard of one's rights." Id. (alteration in original) (quotation omitted); see also Crump v. P & C Food Mkts., Inc., 154 Vt. 284, 297, 576 A.2d 441, 449 (1990). The fact finder can infer malice from the parties' circumstances and the nature of the offending behavior. L'Esperance v. Benware, 2003 VT 43, ¶ 18, 175 Vt. 292, 830 A.2d 675.

¶ 88.    If malice is proven, the trial court has the discretion to impose punitive damages. See Crump, 154 Vt. at 297-98, 576 A.2d at 449 ("Once evidence was presented which could support [finding of malice] by the jury, the imposition of punitive damages was within the discretion of the jury."). The calculation of those damages is within the trial court's discretion. See Pion v. Bean, 2003 VT 79, ¶ 44, 176 Vt. 1, 833 A.2d 1248 (noting that when evaluating punitive damage award, we defer to trial court because "[p]unitive damages by their nature cannot be precisely measured"); Post & Beam Equities Grp., LLC, 2015 VT 60, ¶ 39 (same); Bolsta v. Johnson, 2004 VT 19, ¶ 9, 176 Vt. 602, 848 A.2d 306 (mem.) (explaining that we review trial court's findings related to punitive damages for abuse of discretion).

¶ 89. After examining the total evidence, the court concluded that Howell's ill will was mainly directed at the Springer-Millers—who were not the plaintiffs in connection with the defamation claim—rather than the company itself. We cannot say that the court's conclusion on this point is clearly erroneous or unsupported by the record. Howell clearly bears animus towards the Springer-Millers, who he feels forced him out of the company for fraudulent reasons, and many of the defamatory statements were directed at Spring-Miller personally.

¶ 90. More important, the court's conclusion that punitive damages were unwarranted in the face of an evidentiary vacuum concerning Howell's resources is supported by our caselaw. "We have stated that, in assessing punitive damages, the fact-finder must take into account the character and the standing of the party, the malice or wantonness of the party's conduct, and the party's financial status." Pion, 2003 VT 79, ¶ 44. Faced with no evidence of the latter factor, the trial court reasonably declined to impose punitive damages.

D. Tortious Interference with Contract

¶ 91. The trial court ruled in favor of Howell on Kneebinding's tortious-interference-with-contract claim in its post-trial 2016 decision. The court concluded that Howell acted intentionally to interfere with Kneebinding's contract with its plastic vendor by sending the cease and desist letter in May 2015, causing a two-day production delay. And the court noted that Howell's motives in sending the letter were improper, as evidenced by his adversarial relationship with the Springer-Millers. However, the court held that Kneebinding had failed to satisfy all the elements of its interference-with-contract claim because "there [was] no evidence that [the vendor] substantially failed to perform or that either party lost any particular amount of money." The court explained that although "Howell's conduct amounted to attempted interference, this claim must fail because it has not been shown by persuasive evidence that Kneebinding, Inc. was harmed to any material extent by the communication."

¶ 92. On appeal, Kneebinding argues that there was evidence of Howell's intentional interference with Kneebinding's contracts, as demonstrated by his cease and desist letter to Kneebinding's vendor, and by trial testimony from a ski shop manager that Howell would come to his shop and make negative claims about the safety of the bindings—evidence that Kneebinding argues the trial court ignored.

¶ 93. It is well established that "one who intentionally intrudes to disrupt an existing contract relation" may be liable in tort. Mitchell v. Aldrich, 122 Vt. 19, 22, 163 A.2d 833, 835-36 (1960). We have explained:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the person to perform the contract.

Williams v. Chittenden Tr. Co., 145 Vt. 76, 80, 484 A.2d 911, 913 (1984) (quotation omitted). Put slightly differently, "the defendant must have intentionally and improperly induced or caused the owner not to perform under its contract with the plaintiff." Id. To recover, the plaintiff must have suffered harm from the interference, Foster & Gridley v. Winner, 169 Vt. 621, 624, 740 A.2d 1283, 1287 (1999) (mem.), which "includes such loss as the plaintiff can prove to have resulted directly and proximately from the defendant's wrongful acts." Giroux v. Lussier, 127 Vt. 520, 524, 253 A.2d 151, 155 (1969). The Restatement (Second) of Torts explains that "[t]he cause of action is for pecuniary loss resulting from the interference," but the plaintiff may also recoup for consequential losses, emotional distress, or actual harm to reputation. Restatement (Second) of Torts § 766 cmt. t (Am. Law Inst. 1979); see also id. § 774A.

¶ 94. We affirm the trial court's conclusion that Kneebinding failed to prove the needed element of damages. Although Kneebinding makes a convincing argument on appeal that Howell acted to interfere with its contractual relationships, the trial court largely agreed with them on this point. Kneebinding, however, has not pointed to evidence that demonstrates the actual damage—

38

whether that be pecuniary loss, emotional distress, or damage to reputation—that it suffered as a result of this attempted interference.

## E. Attorney's Fees

¶ 95. Kneebinding and the Springer-Millers challenge the trial court's refusal to award them attorney's fees arising from the litigation as a whole, and argue that the fees the court did award Kneebinding for litigating the contempt claim were inadequate. In support of the first point, Kneebinding and the Springer-Millers argue that: (1) the Series A-preferred-stock-purchase agreement and various associated agreements incorporated therein provide a contractual basis for attorney's fees; (2) all claims in this case share a common core of facts so their contractual right to recover fees extends to virtually every claim in the case; and (3) Kneebinding and the Springer-Millers' overall success in the litigation supports an award of attorney's fees. On the second point, they argue that Howell's flagrant and prolonged violations of the permanent injunction require a larger award of fees for contempt than awarded by the trial court.

¶ 96. Vermont, like many other states, adheres to the "American Rule": each party generally pays their own litigation expenses unless a statutory mandate or contractual provision provides otherwise. See, e.g., In re Gadhue, 149 Vt. 322, 327, 544 A.2d 1151, 1154 (1987). However, in "exceptional cases and for dominating reasons of justice," a trial court may, under its equitable powers, depart from the American Rule. Id. at 330, 544 A.2d at 1156 (quotation omitted); see also Vt. Women's Health Ctr., 159 Vt. at 151, 617 A.2d at 417.

¶ 97. Kneebinding and the Springer-Millers do not claim a statutory basis for assessing attorney's fees in this case. Instead, they argue that they are entitled to substantial awards of attorney's fees on contractual grounds, and on the basis of Howell's persistently contemptuous conduct. We consider each basis for an award of fees in turn.

## 1. Contractual Fee Shifting

¶ 98. The trial court's August 2016 decision noted that "[v]arious agreements referred to in this opinion have provisions for attorney's fees and the expenses of litigation" but the court would decide whether to award attorney's fees "at a later date" so that the parties could provide evidence and briefing. The court explained that:

> Although only [Kneebinding] has prevailed as to liability in this case, it has not by any means prevailed on all the theories or all the arguments presented. [Howell] has won a substantial share of them. The court does not presently see this issue as merely the question of who was the prevailing party overall. In a complex case such as this one, should a party not be awarded attorney's fees for a theory or factual assertion successfully defended?

¶ 99. After a hearing in October 2016, at which Kneebinding and the Springer-Millers presented expert testimony, the court issued a second opinion on Kneebinding and the Springer-Millers' motions for attorney's fees in January 2017.

¶ 100. The court concluded that the contractual grounds for a fee award in this case were extremely narrow, and rejected Kneebinding's argument that the stock-purchase agreement, the voting-rights agreement, and the severance agreement all provided bases for an attorney's fee award in this case. It found that the stock-purchase agreement had a general provision for attorney's fees relating to <u>enforcement or interpretation of that agreement</u>. The only other pertinent mention of attorney's fees in the various documents comprising the parties' agreement were in the investor-rights agreement and the voting-rights agreement, and those provisions provided for fee shifting only in the context of mandatory arbitration. The court was mindful that the merger clause in the stock-purchase agreement identified all of the other associated transaction agreements as part of the overall agreement between the parties. But it concluded that the fact that the dispute resolution provisions in the voting-rights agreement and the investor-rights agreement pertain only to arbitration and requires an award of attorney's fees to the prevailing party in that specific context, "supports an interpretation that they are distinct agreements" from the stock-purchase

agreement, "to be read separately" with respect to fee-shifting terms. The court further noted that the severance agreement does not have an attorney's-fees clause. The severance agreement, the court explained, does reference several of the transaction documents, but it does not mention the stock-purchase agreement—the only transaction agreement that provides for attorney's fees outside of arbitration. Accordingly, the court concluded that the only claims potentially subject to contractual fee shifting were those claims involving interpretation or enforcement of the stock-purchase agreement.

¶ 101. Reviewing the parties' respective claims and counterclaims, the court concluded that the only claim that required interpretation of the Series A-preferred-stock-purchase agreement, and that thus potentially supported an award of attorney's fees, was Howell's third-party derivative claim that the Springer-Millers had breached their fiduciary duties by failing to adequately finance the company. The court declined to award fees to the Springer-Millers for prevailing on this "make-weight" claim because "[n]o facts were contested," and the "only question" was "whether or not [John Springer-Miller] was contractually obligated" to provide the financing, which merely required a review of the document itself to resolve.

¶ 102. Further, the court rejected Kneebinding and Springer-Millers' efforts to sweep the entire course of litigation into the narrow contractual fee-shifting provision on the basis that the issues in the litigation all arose from a "common core of facts." Instead, the court categorized the parties' claims into four discrete groups: (1) Kneebinding's claims for contempt, defamation and breach of contract; (2) Howell's fraud claims; (3) Howell's defamation action; and (4) Howell's derivative claims and Kneebinding's direct claims. Kneebinding's contempt, defamation, and breach of contract claims, the court noted, related to events stemming from Howell's alleged violations of the severance agreement and ensuing permanent injunction. On the other hand, the court explained, Howell's fraud and unjust enrichment claims required probing communications between Howell and John Springer-Miller before the parties' 2007 transaction. Further still,

Howell's breach of fiduciary duty claims involved examining the 2007 transaction documents. And, the court determined, Kneebinding's tortious interference with contract, misappropriation of trade secrets, trademark infringement, and unfair competition claims involved exploring Howell's communications with Kneebinding's vendor and "[t]o the extent any facts related to the misappropriation of trade secrets claim overlapped with the breach of contract claim or the trademark claim, or implicated the Series A Stock Purchase Agreement, [Kneebinding] failed to prevail on these claims."

¶ 103. Kneebinding and the Springer-Millers' argument on appeal that they are entitled to a contract-based award of attorney's fees for the entirety of their litigation costs rests on two premises: first, that the parties' contract establishes a basis for fee shifting in connection with at least some of the claims at issue in this case, and second, that all of the issues in this litigation arise from a common core of facts such that their contractual right to fees as the prevailing party extends to all of the claims they successfully prosecuted or defended. We reject both these premises.

a. Fee Shifting Under the Parties' Agreements

¶ 104. Kneebinding and Springer-Miller's arguments for contractual fee shifting are based on several related agreements executed by the parties. As noted, the stock-purchase agreement has a specific provision for attorney's fees:

> If any action at law or in equity (including arbitration) is necessary to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to reasonable attorney's fees, costs and necessary disbursements in addition to any other relief to which such party may be entitled.

¶ 105. That agreement also includes a subsequent, separate section entitled "Entire Agreement":

> This Agreement (including the Exhibits hereto), the Restated Certificate and the other transaction agreements constitute the full and entire understanding and agreement between the parties with respect to the subject matter hereof, and any written or oral agreement relating to the subject matter hereof existing between the parties are expressly canceled.

¶ 106. The investor-rights agreement and voting-rights agreement are among the other transaction agreements referenced in the "Entire Agreement" clause of the stock-purchase agreement. They each have "Entire Agreement" sections identical to the stock-purchase agreement, but, unlike that agreement, they only mention attorney's fees in the context of provisions mandating arbitration, labeled "dispute resolution":

> Any unresolved controversy or claim arising out of or relating to this agreement, except as otherwise provided in this agreement, shall be submitted to arbitration . . . . The prevailing party shall be entitled to reasonable attorney's fees, costs, and necessary disbursements in addition to any other relief to which such party may be entitled.

(Emphasis added.)

¶ 107. The parties' severance agreement does not include an attorney's fees provision of any sort. It includes the following language that Kneebinding deems relevant:

> This letter agreement, including Attachments A and B, contains and constitutes the entire understanding and agreement between the parties hereto with respect to [Howell's] severance benefits and the settlement of claims against the Company and cancels all previous oral and written negotiations, agreements, commitments and writings in connection therewith. Nothing in this paragraph, however, shall modify, cancel or supersede [Howell's] obligations set forth in . . . (b) the Investor's Rights Agreement, Voting Agreement, Right of First Refusal and Co-Sale Agreement, and Indemnification Agreement, each dated as of November 2007, which shall continue in full force and effect . . . .

¶ 108. Kneebinding's argument for contract-based fee shifting appears to be as follows: Kneebinding not only prevailed on its defamation and contempt claims—neither of which have an associated contractual clause for attorney's fees—it successfully defended against Howell's counterclaims, which required interpretation and enforcement of the release provision in the severance agreement. The severance agreement has an "Entire Agreement" provision that incorporates by reference the various transaction agreements, including the investor-rights agreement. Those transaction agreements have, in turn, been incorporated by reference into the stock-purchase agreement. And the stock-purchase agreement includes a fee-shifting provision.

43

¶ 109. The Springer-Millers make a similar argument: they successfully defended against Howell's third-party derivative claims, which required the court's examination of the transaction agreements, including the investor-rights and voting-rights agreements, which triggered the attorney's-fees provision from the stock-purchase agreement that had incorporated those agreements by reference.

¶ 110. We reject these attenuated arguments and conclude that the only fee-shifting provision that could potentially give the prevailing party in court a claim for attorney's fees—the stock-purchase agreement—is extremely narrow and does not reach any significant claims in this case. Neither the investor-rights nor voting-rights agreements is subject to a fee-shifting provision in this circumstance.[19] And the argument that the severance agreement supports Kneebinding's attorney's fee claim fails. We affirm the trial court's decision against awarding fees for the one minor claim subject to the contractual fee-shifting provision in the stock-purchase agreement.

¶ 111. First, the attorney's-fee provision in the stock-purchase agreement is itself limited in scope. It does not purport to apply to any dispute arising from the business relationship between the parties. Instead, by its own terms, it requires an award of fees to the prevailing party "[i]f any action at law or in equity (including arbitration) is necessary to enforce or interpret the terms of this Agreement."

¶ 112. Second, Kneebinding's and the Springer-Millers' attempt to extend the reach of that fee-shifting provision in the stock-purchase agreement to the investor-rights and voting-rights agreements executed at the same time is unsupported by broader principles of law. We note the general rule that when multiple "instruments dealing with the same subject matter are executed at

---

[19] We focus on the investor-rights and voting-rights agreements because Kneebinding or the Springer-Millers prevailed on issues implicating these agreements. The exhibits to the stock-purchase agreement also included the noncompetition-and-nonsolicitation agreement and the invention-and-nondisclosure agreement, but, as Kneebinding did not prevail on claims related to these agreements, and has not adequately briefed its challenge to the trial court's conclusions on these claims on appeal, we do not address whether those agreements provide for attorney's fees.

the same time by the same parties, the agreements should be construed together." O'Brien Bros.' P'Ship, LLP v. Plocienik, 2007 VT 105, ¶ 15, 182 Vt. 409, 940 A.2d 692. A contract can incorporate another writing by reference and, when this happens, "the other document, or so much of it as is referred to, will be interpreted as a part of the main instrument." Powell v. Bd. of Sch. Dirs., Leland & Gray Union High Sch., 133 Vt. 609, 611-12, 349 A.2d 879, 881 (1975) (quotation omitted); see also Newton v. Smith Motors Inc., 122 Vt. 409, 412, 175 A.2d 514, 516 (1961); 11 Williston on Contracts § 30:25 (4th ed. 2018) ("When a writing refers to another document, that other document, or the portion to which reference is made becomes constructively a part of the writing, and in that respect the two form a single instrument."). The reference must be specific or "by such mutual knowledge and understanding on the part of both parties that reference by implication is clear." Powell, 133 Vt. At 611-12, 349 A.2d at 881 (quotation omitted).

¶ 113. The "Entire Agreement" section of the stock-purchase agreement is a boiler-plate merger clause. In general, a merger clause is designed to bypass "the confusion created when parties may have several agreements or contracts between them prior to completing a written agreement." Hoeker v. Dep't of Soc. & Rehab. Servs., 171 Vt. 620, 621, 765 A.2d 495, 498-99 (2000) (mem.). The clause confirms that the agreement or set of agreements identified therein comprise a complete and exclusive statement of the parties' contract; the "written contract becomes the exclusive medium for determining the understanding of the parties, and prior agreements covering the same subject matter are unenforceable." Id. (citation omitted).

¶ 114. Absent a more specific indication of the parties' intent, a merger clause in and of itself does not incorporate other agreements by reference. See Fit Tech, Inc. v. Bally Total Fitness Holding Corp., 374 F.3d 1, 10 (1st Cir. 2004) (holding that merger clause did not incorporate by reference arbitration clause from one transaction agreement to another because "[a] merger clause does not incorporate other contracts by reference, rather, a merger clause negates the impact of earlier negotiations and contract drafts, and states that the written contract is the complete

extension of the parties' agreement" (quotation omitted)); Rosenblum v. Travelbyus.com Ltd., 299 F.3d 657, 665 (7th Cir. 2002) (same); Rosen v. Mega Blocks Inc., No. 06 Civ. 3474 (LTS)(GWG), 2007 WL 1958968, at *5 (S.D.N.Y. 2007) ("As for the merger clause, it is simply irrelevant to the question of whether the Employment Agreements' arbitration clauses govern the [Stock-Purchase Agreement] . . . . It cannot reasonably be construed to indicate how provisions within various documents relate to each other."). In sum, the fact that the investor-rights and voting-rights agreements are referenced in the stock-purchase agreement as part of the "Entire Agreement" does not in and of itself signal that those associated agreements are incorporated by reference into the stock-purchase agreement and subject to its fee-shifting provision.

¶ 115. Moreover, an examination of the respective agreements supports the conclusion, recognized by the trial court, that each had its own provisions concerning dispute resolution and fee shifting, and each was intended to be applied on its own terms. Neither the voting-rights agreement nor the investor-rights agreement contemplates an award of attorney's fees outside of mandatory arbitration. And none of the various agreements cross-reference or otherwise incorporate the fee-shifting provision in the stock-purchase agreement.

¶ 116. Finally, Kneebinding's argument that the severance agreement is subject to the fee-shifting provision in the stock-purchase agreement by virtue of a reference in the severance agreement to the investor-rights agreement is even more attenuated and unsupported. The reference to these other agreements in the severance agreement appears in the section containing the "Entire Agreement" clause, but they are not actually included within that "Entire Agreement" clause. Rather, they are exceptions to the merger clause; they are included to acknowledge that, although the severance clause supersedes many of the parties' pre-existing contractual obligations, their obligations pursuant to the identified agreements, including the investor-rights and voting-rights agreements, persist beyond execution of the severance agreement. Even if the investor-rights agreement could serve as a stepping stone to the fee-shifting provision in the stock-purchase

agreement, the severance agreement does not in any way purport to incorporate the investor-rights agreement.

¶ 117.  For these reasons, we agree with the trial court that the only fee-shifting provision applicable to any claims on which the parties prevailed is in the stock-purchase agreement, and conclude that the trial court did not abuse its discretion in declining to award any fees pursuant to that provision.  The trial court decided not to award attorney's fees for the Springer-Miller's successful defense of the only claim that involved interpretation of the stock-purchase agreement: Howell's claim that the Springer-Millers breached their fiduciary duties by failing to provide additional debt financing.  As noted above, in its January 2017 decision, the trial found that this was a "make-weight" claim that did not involve disputed facts and just required the court to examine the agreement itself.  Kneebinding and the Springer-Millers have not argued on appeal as to how this conclusion is error, and we cannot say that the court abused its discretion.

¶ 118.  Because we conclude that no other claim that the Springer-Millers or Kneebinding successfully prosecuted or defended against is subject to a contractual attorney's-fee-shifting provision, we affirm the trial court's denial of contractual attorney's fees.

b.  Common Core of Facts

¶ 119.  The above analysis is controlling regardless of whether the claims in this case arise from a common core of facts.  Absent a contractual basis for shifting fees, the existence of a common core of facts becomes irrelevant with respect to any contract-based claim of an exception to the American Rule.  Nevertheless, we conclude that even if Kneebinding or the Springer-Millers established some contractual basis for an award of attorney's fees, the trial court did not err in rejecting their argument that the award would extend to the litigation as a whole because the various claims arose from a "common core of facts."[20]

_____

[20]  Our analysis on this point would likewise preclude any attempt by Kneebinding to leverage the award of attorney's fees on account of Howell's contempt of the permanent injunction to include their fees for the litigation as a whole.

¶ 120. Kneebinding and the Springer-Millers argue that "[e]very element of this litigation arose out of the 2007 transaction between the parties, the 'Transaction Agreements' that memorialized it, KneeBinding's efforts to enforce those agreement[s] and Howell's stipulated injunctive orders, as well as Howell's multi-theorized direct and derivative claims." They argue that the evidence presented during the trial "was relevant to all claims and defenses," rendering it "impossible, and improper for the court to view this litigation as a 'series of discrete claims such that hours expended can be divided and compensated on [a] claim-by-claim basis.' " Pointing to their overall success in the litigation, Kneebinding and the Springer-Millers argue that they are entitled to an award of fees for the litigation as a whole.

¶ 121. When there are existing grounds for attorney's fees, all "claims at issue share a common core of facts and multiple theories of recovery," and "[v]irtually all of the evidence is relevant to all of the claims," then dividing the suit into a series of discrete claims and apportioning the attorney's fees for each is an abuse of discretion. The Elec. Man, Inc., v. Charos, 2006 VT 16, ¶ 10, 179 Vt. 351, 895 A.2d 193; see also Post & Beam Equities Grp., LLC., 2015 VT 60, ¶ 48 (noting that "it is frequently impossible to parse out, claim-by-claim, legal services rendered in cases involving a common core of facts" (quotation omitted)). In these instances, the trial court should assess the plaintiff's overall success in relation to the number of hours reasonably expended on the litigation. Post & Beam Equities Grp., LLC., 2015 VT 60, ¶ 48.

¶ 122. The trial court did not abuse its discretion in determining that the multitude of direct claims, counterclaims, and third-party claims in this case covered distinct evidentiary and legal ground, and lacked a common core of facts. Kneebinding's contempt and defamation claims, for instance, required the court to consider the nondisparagement provision in the parties' severance agreement, the court's TRO and permanent injunction, and Howell's conduct and statements to third parties from 2009 through 2015. Kneebinding's tortious-interference-with-contract claim, on the other hand, centered around Howell's 2015 correspondence with its plastics vendor.

48

Howell's various fraud and unjust enrichment claims required an analysis of the parties' pretransaction negotiations from 2007, and their subsequent falling-out. Put simply, the court had ample grounds to conclude that the claims, or clusters of claims in this case were discrete, and that the underlying facts and supporting evidence was not so intertwined that the court could not readily parse the distinct claims, and the legal work associated with them. See Southwick, 2011 VT 105, ¶ 8 (explaining that although parties' direct and third-party claims "might have been set in motion by the same event, they are not based on a common core of facts" because direct claim for negligence "required facts regarding the design, construction, and maintenance" of playground equipment while third-party claims "hinged on the language of" agreement to host event "and its reasonable interpretation").

### 2. Attorney's Fees for Contempt

¶ 123. The court did award Kneebinding attorney's fees on account of Howell's contempt, but Kneebinding and the Springer-Millers argue that the court abused its discretion in declining to award more.

¶ 124. Although it rejected their claims for contractual attorney's fees, in its January 2017 decision the court invoked the other exception to the American Rule noted above, for "exceptional cases" in which "dominating reasons of justice" require an award of fees, and concluded that Kneebinding was entitled to attorney's fees in connection with litigation concerning Howell's contempt. The court gave the parties additional time to parse the time related to work on the contempt case and supply the court a fee affidavit.

¶ 125. After additional briefing from the parties, the court released its final decision on attorney's fees in April 2017. The court concluded that the hourly rates charged by Kneebinding's current counsel, Anderson & Associates, and former counsel, Gravel & Shea, were "reasonable" and that the real "dispute here is over whether the fees charged accurately and appropriately reflect the work done on the relevant contempt claim." Kneebinding claimed attorney's fees—just related

49

to the contempt claim—of $30,495 for services from Gravel & Shea from the inception of the claim through April 2010, when the firm withdrew its representation; $54,784.86 for pretrial services from Anderson & Associates from November 2010 through November 2015; $43,074.73 for trial services from Anderson & Associates, spanning twenty days over November and December 2015; and $49,009.72 for post-trial services from Anderson & Associates, for a grand total of $177,364.31.

¶ 126. The court began by declining to award fees related to Gravel & Shea's services from the inception of the action through March 2010. In so holding, the court noted its previous ruling that Kneebinding "may recover reasonable attorney's fees and expenses which were incurred in filing and litigating the motions for contempt filed subsequent to and as a result of Mr. Howell's alleged violations of the permanent injunction which the court has found to be substantiated." The court concluded that when the parties entered the stipulated agreement for contempt, which carried the potential for the $7000 fine, the agreement "disposed of the initial contempt issues" and "Gravel & Shea largely would have had to perform the work they did in preparation for the preliminary hearing at which the contempt issue was settled, irrespective of whether Mr. Howell violated the TRO."

¶ 127. The court then ruled on Kneebinding's request for pretrial fees. It noted that although Kneebinding's expert testimony on attorney's fees did not specifically delineate contempt-related fees, "there is no argument that the work was not done." The court explained that it undertook "its own analysis of [Anderson & Associates'] entries, including the amounts sought for reimbursement, to identify those entries sufficiently detailed to show a connection with the contempt issues" and that it "excluded others where the relationship is uncertain or seem to involve work on other issues." In an attachment to the decision, the court delineated the fees it approved, totaling $13,715.37.

¶ 128. Next, the court examined Kneebinding's request for trial-related fees from Anderson & Associates. The court explained that it reviewed its own trial notes, combed through the trial transcript day by day, estimated the amount of time that Kneebinding spent litigating the contempt issue, and determined that Kneebinding's request was "excessive." A reasonable amount, the court concluded, based on Anderson & Associate's rate for the total number of trial hours devoted to the contempt issue is $11,527.69. In support of this amount, the court noted that it had "made a general observation based on having presided over judicial proceedings for many years" about "what a trial would have looked like in terms of length and scope in the absence of Howell's third party claims against the Springer-Millers" had it considered only Howell's violations of the March 30 "permanent injunction," and it estimated that the claim would require approximately five full days of trial. Five ten-hour days at Anderson & Associate's rate of $231.75, the court calculated, came to $11,587.50—which was "very close to the amount calculated by the Court based on its review of the trial transcript."

¶ 129. The court then moved to Kneebinding's claims for post-trial attorney's fees. It explained that "[t]he crux of any determination of attorney's fees is that they be reasonable," and that the affidavit from Anderson & Associates indicated that it spent 325 hours post-trial on the contempt issue alone, which was not reasonable. The court concluded that, "[h]ad the trial consisted of no more than the violations of paragraph [one] of the permanent injunction, it is difficult to see how the post-trial requests and memos would have consumed more than one week," and "[a]ssuming eight-hour days at $231.75 per hour, one week of time spent would amount to $9,270.00 in fees."

¶ 130. Finally, after having determined the total reasonable amount of pretrial, trial, and post-trial attorney's fees for litigating the contempt claim, the court went through the "lodestar figure" analysis, which involves taking the number of hours reasonably expended on the case, multiplied by a reasonable hourly rate, with that result then adjusted up and down based on various

51

factors.[21] The court noted that the total lodestar figure as calculated above came to $34,512.96, and it explained that since the fees were limited to contempt, few of the factors warranted an upward or downward adjustment. Ultimately, however, the court concluded that the initial figure should be adjusted downward by thirty-five percent "based upon the results achieved for [Kneebinding], the only plaintiff in this case, the lack of expert evidence, the Court's review of the record, and the uncomplicated legal issue." Accordingly, the final award of attorney's fees came to $22,433.42.

¶ 131. Kneebinding argues that the court abused its discretion in awarding this amount. It contends that the court erroneously ignored Gravel & Shea's fees because "the majority" of its billing occurred after the injunction and the stipulation regarding contempt. In addition, Kneebinding contends that the trial court erred in determining Anderson & Associate's fees for pretrial, trial, and post-trial services because the "time and effort to file, investigate, research, collect evidence, prepare for and try the contempt case was extensive in relation to the other work done."

---

[21] The lodestar figure reflects the number of hours reasonably expended on the case multiplied by a reasonable hourly rate. The court may then adjust this figure upward or downward depending on various so-called Johnson factors, named after Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717-19 (5th Cir. 1974), as cited in Hensley v. Eckerhart, 461 U.S. 424, 430 n.3 (1983). Spooner, 2010 VT 71, ¶ 8. The factors include:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

Id.; see also L'Esperance, 2003 VT 43, ¶ 22 (explaining "lodestar figure" process for calculating attorney's fees).

¶ 132. We reiterate that courts have broad discretion in calculating a reasonable amount of attorney's fees. Spooner, 2010 VT 71, ¶ 7.

¶ 133. The court exceeded its discretion in declining to award fees for the services provided by Gravel & Shea in connection with enforcement of the permanent injunction. The trial court's determination that fees expended in filing the initial complaint in this case, seeking a TRO, and moving to enforce that TRO were beyond the scope of its award of fees for Howell's contempt of the permanent injunction was well within its discretion. As the court pointed out, these fees did not arise from efforts to enforce the permanent injunction; they relate to services that preceded the stipulation and order creating that injunction. But the court inferred that all of the fees to Gravel & Shea fell within this category—an inference that is at odds with the undisputed evidence in the record. In fact, the billing records from Gravel & Shea, incorporated into the fee affidavit of Kneebinding's counsel, show significant legal fees for preparing and filing a second motion for contempt nearly a year after issuance of the permanent injunction. The billing records reflect nearly $8000 in legal fees for services squarely within the parameters of the court's fee award: they were provided beginning in March 2010 and relate directly to motions seeking to enforce the permanent injunction in the face of Howell's contemptuous violations. We express no opinion as to the reasonableness of these charges, or whether the court must award additional fees commensurate with these charges, but remand for reconsideration of this aspect of the court's fee award insofar as the court's findings suggest the court did not consider these charges. See Vt. Nat. Bank v. Clark, 156 Vt. 143, 145, 588 A.2d 621, 622 (1991) (court may not exercise its discretion "for clearly untenable reasons or to a clearly untenable extent").

## II. Howell's Derivative and Direct Claims

¶ 134. Although the legal arguments in Howell's brief are difficult to discern, he appears to argue in his cross-appeal that the court erred in ruling on his third-party derivative and direct claims against the Springer-Millers for fraud and various breaches of fiduciary duties.[22]

¶ 135. We note at the outset that the trial court first held that Howell was not entitled to represent the minority shareholders through derivative claims because the remedy that he seeks—recession of the 2007 transaction—is antithetical to his fellow minority shareholders' interests. See V.R.C.P. 23.1 (establishing that "derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of the shareholders or members similarly situated in enforcing the right of the corporation or association"). This dispositive holding resolved Howell's claims. Because the trial court additionally offered alternate bases for its judgment against Howell by evaluating his claims on the merits, we will address Howell's challenges to the trial court's rulings on the merits of Howell's claims to the extent we understand Howell's arguments.

¶ 136. We address Howell's arguments regarding fraud in the inducement and breach of fiduciary duties in turn.[23]

---

[22] He alludes to other legal arguments in his brief, but does not provide enough information to enable us to review them. See Franzoni v. Newman, 118 Vt. 421, 423, 110 A.2d 716, 717 (1955) (explaining that inadequate briefing "merits no consideration"). For example, he asserts that the court erred in admitting evidence that it had previously barred. We cannot review this claim because he does not specify what specific evidence or cite to the transcript. Similarly, he argues that the court erred in granting remedies to the Springer-Millers but does not identify the remedies at issue.

[23] Howell raises several arguments on appeal that we can quickly dispense with. First, he argues that his share in the company has been diluted, as evidenced by John Springer-Miller's testimony at trial that Howell owns "twenty-something percent" of the company. Because this claim was not raised below, and because the testimony that Howell refers to has no legal significance or bearing on the merits of this case, we decline to address it here.

Second, Howell contests a comment the court made in one of its decisions about some of the litigation delays being Howell's fault. This comment from the trial court has no bearing on the merits of the case and we decline to address it.

## A. Fraud in the Inducement

¶ 137. In the court below, Howell premised his derivative claim of fraud in the inducement on the theory that John Springer-Miller was deceptive during their pretransaction negotiations. Howell argues that Springer-Miller induced him to sell a controlling stake of Kneebinding by promising that Howell would continue to run the company; however, this was a ruse—Springer-Miller never intended for Howell to run the company, as evidenced by his interference with the company's day-to-day operations almost immediately after the transaction and his eventual decision to terminate Howell's employment.

¶ 138. The trial court denied this claim in its August 2016 decision. While the court agreed that the transaction documents[24] gave Howell managerial control of the company through his role as president and CEO, it concluded that the parties' pretransaction negotiations demonstrate that Springer-Miller was not interested in day-to-day control of the business, had trepidations about

Third, Howell asserts that the "entire agreement" provision in the severance agreement cancels all prior contracts, and therefore cancels all prior transaction agreements between himself and the Springer-Millers—which would revert company control back to Howell. This theory is patently false. The referenced provision states that the severance agreement "constitutes the entire understanding and agreement between the parties hereto with respect to [Howell's] severance benefits and the settlement of claims against the Company and cancels all previous oral and written negotiations, agreements, commitments and writings in connection therewith." The agreement then states "Nothing in this Paragraph, however, shall modify, cancel or supersede your obligations" pursuant to various identified agreements in connection with the parties' prior transaction. A plain reading of this provision demonstrates not that all past contracts between the parties were cancelled, but rather that past agreements relating to severance benefits and the settlements of claims were cancelled.

Fourth, Howell argues that he never signed the Attachment B to the severance agreement, which was the release-of-claims provision for an attached consulting agreement. We previously addressed and rejected this same argument in our 2014 interlocutory decision dismissing most of Howell's counterclaims. Kneebinding, Inc., 2014 VT 51, ¶ 15. The claim has no bearings on the remaining issues in this case.

[24] We note briefly the trial court's choice of law analysis. After examining the transaction documents, the court found that they contain conflicting choice of law provisions—some provide that the document should be construed under Vermont law, while others specify Delaware law. The court applied the "most significant relationship test," and concluded that it should apply Vermont law to Howell's derivative claims. Pioneer Credit Corp. v. Carden, 127 Vt. 229, 233, 245 A.2d 891, 893-94 (1968). No party has challenged this conclusion on appeal.

Howell's ability to lead to company, and wanted a business plan that would make the company successful quickly. The court explained that "[t]he record is devoid of evidence that Mr. Springer-Miller intended all operations of the Company [to] be solely under Mr. Howell's leadership, with no strings attached." Instead, the court determined, Springer-Miller sought to protect his investment by gaining control over the board of directors and by establishing that Howell's employment would be "at will."

¶ 139. The court concluded that John Springer-Miller did not renege on that deal. It noted that Howell was terminated when it became apparent that the binding would not be ready for sale by the 2008-2009 ski season. The court explained that it was not surprising that Springer-Miller would take steps to remove Howell when the expectations that he set were not met, and concluded that there was no evidence that Springer-Miller did not intend for Howell to run the company when he first purchased the controlling stake in the company from Howell.

¶ 140. On appeal, Howell argues that the court erred because documents from the parties' pre-transaction negotiations reveal that John Springer-Miller represented that he wanted Howell to run the company, only to turn around immediately after the transaction closing and meddle in Howell's ability to manage company operations and then force Howell out of the company shortly later. As such, Howell contends, Springer-Miller never intended to let him manage the company and plotted all along to take over the company at the first opportunity. As a remedy, Howell seeks rescission of the transaction agreement and damages of $2,586,310—a figure he estimates was the value of the company at the time of the transaction.

¶ 141. To succeed, Howell must demonstrate the elements of fraud by clear and convincing evidence. See Bennington Hous. Auth. v. Bush, 2007 VT 60, ¶ 8, 182 Vt. 133, 933 A.2d 207 (citing Gavala v. Claassen, 2003 VT 16, ¶ 8, 175 Vt. 487, 819 A.2d 760 (mem.)) (recognizing that "in all cases where fraud is alleged, it must be proved by clear and convincing evidence."). Fraud in the inducement entails "the intentional misrepresentation of existing fact,

affecting the essence of the transaction" when "the misrepresentation was false when made and known to be false to the maker, was not open to the defrauded party's knowledge, and was relied on by the defrauded party to [their] damage." Union Bank v. Jones, 138 Vt. 115, 121, 411 A.2d 1338, 1342 (1980). The intentional misrepresentation of future action creates a misrepresentation of existing fact in that the actor has lied as to their current intention. Id. To satisfy the element that the misrepresentation was made with knowledge of its falsity, "the person accused, and not a hypothetical reasonable person must be found to have known that the statement was false, or to have made that statement with reckless indifference as to its truth." Bennington Hous. Auth., 2007 VT 60, ¶ 9. Generally, fraud is a question for the fact finder, which we review for clear error. See Winston v. Johnson & Dix Fuel Corp., 147 Vt. 236, 243, 515 A.2d 371, 376 (1986). That means the question for this Court is not how we weigh the evidence, but is whether the trial court's findings and conclusions were supported by evidence in the record.

¶ 142. The trial court's conclusion that Howell did not prove fraud in the inducement is supported by the record. To begin, the record evidence demonstrates that during the parties' pre-transaction negotiations, John Springer-Miller was interested in Howell's invention but was wary of his business acumen. John Springer-Miller testified during the trial that he wanted to invest based on the company's intellectual property, and that he had reservations about Howell's ability to run the company. The email exchanges between Howell and John Springer-Miller during their pre-transaction negotiations further buttress this point. Based on this evidence, it was reasonable for the court to conclude that when they agreed to purchase the company, the Springer-Millers fully intended to give Howell the opportunity to run the company, while also making sure that they had safeguards in place should this arrangement fail. This conclusion is supported by the fact that the board had legitimate reasons for ending Howell's leadership role. From December 2007 through his termination in September 2008, Howell struggled to meet production deadlines, made false representations to the Springer-Millers about product sales, at times communicated with John

Springer-Miller only through his attorney, and clashed with the company's plastics vendor. In sum, the trial court's findings and conclusions on this claim are supported by the record.

## B. Breach of Fiduciary Duties

¶ 143. In the court below, Howell asserted that the Springer-Millers breached their fiduciary duties as company board members for failing to provide minority shareholders with financial information, hold monthly director's meetings, hold annual meetings, appoint an independent director, provide debt financing, follow the business plan, pursue a prospective investor, and for terminating Howell without a suitable replacement. On appeal, he appears to specifically challenge the court's conclusions regarding his claims that the Springer-Millers failed to provide debt financing or appoint the requisite number of board members according to the transaction documents.

¶ 144. As board directors, the Springer-Millers must carry out their fiduciary obligations to the company: "(1) [i]n good faith[;] (2) [w]ith the care an ordinarily prudent person in a like position would exercise under similar circumstances[; and] (3) [i]n a manner the director reasonably believes to be in the best interest of the corporation . . . ." 11A V.S.A. § 8.30(a)(1)-(3); see also, e.g., J.A. Morrissey, Inc. v. Smejkal, 2010 VT 66, ¶ 10, 188 Vt. 245, 6 A.3d 701 (explaining requirements for establishing claim for breach of fiduciary duty). Put slightly differently, a director's relationship with the company binds the director "to use the utmost good faith and loyalty for the furtherance and advancement of the interest" of the company, and the director is "not permitted to make profit . . . in the transaction of the business of the corporation, against its interest." Lash v. Lash Furniture Co. of Barre, 130 Vt. 517, 522, 296 A.2d 207, 210 (1972).

## 1. Debt Financing

¶ 145. In his derivative claim below, Howell contended that John Springer-Miller failed to honor a promise outlined in the transaction documents to provide the company with an

additional $500,000 in debt financing, and without this promise, Howell would not have agreed to the transaction. Howell asserted that Springer-Miller's refusal to honor his commitment demonstrated a lack of good faith and due care.

¶ 146. In answering this question, the court examined the stock-purchase agreement, which contains the following provision:

> 4.12 Additional Debt Financing. The purchaser acknowledges that the Company may require additional debt financing of up to $500,000 within the first year of operations (the "Debt Financing"), and that potential lenders may require a personal guaranty. If such a guarantee is required as a condition to obtaining the Debt Financing, the Purchaser agrees to serve as a guarantor of the Debt Financing, on such terms as are approved by the Purchaser and the Board of Directors of the Company.

The court, however, noted this additional provision in the agreement:

> 8.15 No Commitment for Additional Financing. The company acknowledges and agrees that no Purchaser has made any representation, undertaking, commitment or agreement to provide or assist the Company in obtaining any financing, investment or other assistance, other than the purchase of the Shares as set forth herein and subject to the conditions set forth herein. In addition, the Company acknowledges and agrees that (i) no statements, whether written or oral, made by any Purchaser or its representatives on or after the date of this Agreement shall create an obligation, commitment or agreement to provide or assist the Company in obtaining any financing or investment, (ii) the Company shall not rely on any such statement by any Purchaser or its representatives and (iii) an obligation, commitment or agreement to provide or assist the Company in obtaining any financing or investment may only be created by a written agreement, signed by such Purchaser and the Company, setting forth the terms and conditions of such financing or investment and stating that the parties intend for such writing to be a binding obligation or agreement. Each Purchaser shall have the right, in it[s] sole and absolute discretion, to refuse or decline to participate in any other financing of or investment in the Company, and shall have no obligation to assist or cooperate with the Company in obtaining any financing, investment or other assistance.

The court concluded that, based on the above language, Howell and Kneebinding "were put on notice" that John Springer-Miller was not committed to providing any additional financing beyond his original $1,065,000 investment and "[i]n the face of such clear language, any argument that

Mr. Springer-Miller had guaranteed such financing is unavailing." Furthermore, the court noted that there was no evidence to suggest that Howell had been fraudulently induced to enter the transaction based on a promise of the extra $500,000 debt guarantee, and as Springer-Miller was not legally bound to provide this money, "it is difficult to see how his failure to provide the guarantee was a breach of fiduciary duty."

¶ 147. We agree with the court's assessment.

## 2. Board Composition

¶ 148. Howell argues that the Springer-Millers breached their fiduciary duty by failing to elect a five-person board of directors, including an independent director that would provide additional industry expertise.

¶ 149. In addressing this issue in its August 2016 decision, the court began by examining the stock-purchase agreement, which states that "the authorized size of the Board shall be five (5), and the Board shall comprise the following members: Rick Howell, [and the Springer-Millers]." The court then noted section 3.2 of the amended and restated certificate of incorporation—one of the transaction documents:

> 3.2 The Board of Directors of the Corporation shall consist of five (5) members. The holders of record of the shares of Series A Preferred Stock, exclusively and as a separate class, shall be entitled to elect three (3) directors of the Corporation (the "Series A Directors") and the holders of record of the shares of Common Stock and the Series A Preferred Stock, voting together, shall be entitled to elect two (2) directors of the corporation. . . . If the holders of shares of Series A Preferred Stock or the holders of shares of Series A Preferred Stock and Common Stock, as the case may be, fail to elect a sufficient number of directors to fill all directorships for which they are entitled to elect directors, voting exclusively and as a separate class, or voting together, as the case may be, pursuant to the first sentence of this Subsection 3.2, then any directorship not so filled shall remain vacant until such time as the holders of the Series A Preferred Stock or the holders of the Series A Preferred Stock and Common Stock, as the case may be, elect a person to fill such directorship by vote or written consent in lieu of a meeting; and no such directorship may be filled by stockholders of the Corporation other than by the stockholders of the Corporation that are entitled to

> elect a person to fill such directorship[,] voting exclusively and as a separate class or voting together, as the case may be.

(Emphasis omitted.) And the court noted that the voting-rights agreement—another of the transaction documents—specifies the board composition. Section 1.2(a) provides that the holders of Series A preferred stock—here, the Springer-Millers—may elect up to three directors and that the Springer-Millers would occupy two of those seats, with a third director "yet to be designated." Section 1.2(b) states that the company founder who holds at least 500,000 shares of common stock—here, Howell—may individually select one member, and that Howell would occupy that seat. Section 1.2(c) specifies that the holders of Series A preferred stock and the holder of a majority of the then-outstanding common stock may together select a director with "substantial business experience relevant to the company's business" and who "is independent of the company." The court concluded that, overall, the arrangement was that the Springer-Millers could appoint three of the five board seats (they would occupy two of those three seats), Howell could select one seat (which he would occupy), and the Springer-Millers and Howell could select a fifth seat together—someone "independent," with substantial, relevant business experience.

¶ 150. Based largely on the court's reading of these transaction documents, it concluded that the Springer-Millers had not breached their fiduciary duties to the company by failing to appoint five directors to the board and for failing to appoint an independent director with relevant business experience. The amended and restated certificate of incorporation, the court noted, provides that "any directorship not so filled shall remain vacant," and thus it "clearly contemplated that there might not be five members on the Board, with no express or implied repercussions." And the court explained that although "the record reflects some lack of diligence on the part of Mr. Springer-Miller and Mr. Howell in identifying and pursuing suitable candidates for the position of independent director, and to otherwise fill the Board vacancies," Howell failed to demonstrate how this negligence amounted to a breach of fiduciary duty. The transaction documents, the court explained, do not provide a consequence for failing to appoint all five

61

potential directors, nor would the appointment of an independent direct have made a difference in the direction of the company since the Springer-Millers still controlled the board—they would still have been able to out-vote Howell and the independent directors three votes to two. The court's assessment is supported by the record and was within its discretion.

With respect to Kneebinding's challenges on appeal, the trial court's refusal to impose the $7000 stipulated fine for Howell's violations of the injunction before September 15, 2009 is reversed; the court's termination of the permanent injunction is reversed; the court's denial of additional contempt sanctions for Howell's violations of the injunction is affirmed; the court's award of damages for defamation is affirmed; the court's judgment for Howell on Kneebinding's claim of tortious interference with contract is affirmed; and the court's decision regarding the parties' claims for attorney's fees is affirmed except that the case is remanded for further consideration of Kneebinding's claim for attorney's fees relating to its efforts to enforce the injunction, consistent with the above analysis. With respect to Howell's challenges on cross-appeal, the trial court's judgment is affirmed.

FOR THE COURT:

_____

Associate Justice

62