Filed 03/03/25


VERMONT SUPERIOR COURT

Rutland Unit
83 Center St
Rutland VT 05701
802-775-4394
www.vermontjudiciary.org



CIVIL DIVISION
Case No. 24-CV-02479

| Trisha Nash v. Kristen Sheehan et al |
|---|

# FINDINGS AND ORDER

This is an action brought by Plaintiff Trisha Nash against Defendants Kristen Sheehan and Sheehan Health Care, PLLC, and Christopher Clogston over a business venture that turned acrimonious. Plaintiff has alleged six causes of action: 1) Conversion as to Kristen Sheehan; 2) Fraud as to Kristen Sheehan; 3) Unjust Enrichment as to Kristen Sheehan; 4) Conversion and Unjust Enrichment as to Sheehan Health Care, PLLC; 5) Respondeat Superior as to Sheehan Health Care, PLLC; and 6) Unjust Enrichment as to Christopher Clogston. Plaintiff is represented by Attorney Matthew Branchaud and Defendants are represented by Attorney Matthew Hart. The court held a bench trial on December 17, 2024.[1] The claim against Christopher Clogston was dismissed by Plaintiff without objection at the start of the bench trial.

At the close of the bench trial, the court gave Plaintiff until January 15, 2025, to inform the court whether she wished to present any additional evidence. In addition, Plaintiff was instructed to inform the court whether she was seeking a monetary judgment, equitable relief, or both. On January 16, 2025, Plaintiff moved to admit Defendants' bank records as Exhibit 6. The court granted Plaintiff's motion on February 3, 2025, as no objection was filed by Defendants. In her motion, Plaintiff indicated she was not seeking specific performance or business liquidation and was only seeking a monetary judgment.

## Findings of Fact

The court makes the following findings of fact by a preponderance of the evidence. Trisha Nash is a licensed Registered Nurse with a bachelor's degree in nursing. Kristen Sheehan is an Advanced Practice Registered Nurse and Nurse Practitioner with a master's degree. Ms. Nash met Ms. Sheehan over a decade ago when both parties worked at the local hospital. In the late summer, early fall of 2023, Ms. Nash and Ms. Sheehan started discussing opening a new business called Reach Health Care. The purpose of the business was to provide primary healthcare services to the public.

Ms. Sheehan had been planning on starting her own business for the prior five years, but had been unable to obtain funding due to her poor credit. Ms. Sheehan prepared a business plan, which was admitted into evidence as Exhibit 4. The plan called for Ms. Nash and Ms. Sheehan to be managing owners of the business. Ex. 4, p. 4. On December 18, 2023, the business was assigned an Employer Identification Number from the Internal Revenue Service. Ex. 4, p. 7.

---

[1] The parties agreed the court could also consider the testimony taken at the July 25, 2024, motion hearing in determining the merits of the case.

On December 15, 2023, Sheehan Health Care, PLLC was registered with the Vermont Secretary of State. Ex. 1. The Secretary of State issued a Certificate of Amendment on January 9, 2024. Ms. Nash and Ms. Sheehan were identified as managers on the paperwork. *Id.* The parties went together to Heritage Federal Credit Union to submit the required paperwork to the Secretary and it was Ms. Sheehan who logged into the Secretary of State's website to do the submission.

Ms. Nash took out $30,000 in unsecured loans to finance the start of the business. The parties spent approximately $15,000 of this on equipment such as computers, exam tables, chairs, and oximeters. In addition, some of this money was used to pay bills, such as rent, electronic medical records, and a billing company. Ms. Sheehan also invested some money into the business. The business expected to recoup spent money through insurance reimbursements, primarily through Medicaid and Medicare. Ms. Nash testified that she believed she was a 50/50 owner of the business. Ms. Sheehan testified she was the sole owner of the business and Ms. Nash was simply an investor.

Ms. Sheehan obtained a lease to use premises located at 198 N. Main Street, Rutland, Vermont to operate the business under the name Reach Community Accessible Health Care. The lease is in her name personally. The business started seeing patients on or about January 15, 2024. Both Ms. Nash and Ms. Sheehan saw patients. When Ms. Nash was not seeing patients, she did clerical work in the office. Ms. Nash did not receive a salary for her work. Ms. Sheehan testified she didn't really know what to consider Ms. Nash, but didn't consider her a co-owner. In addition to working at the business, Ms. Sheehan also worked at her prior employment, Forensic Consultation, until April 15, 2024.

In February of 2024, Ms. Sheehan used funds from the business account at Heritage Family Credit Union to buy Sweeney Todd theater tickets and rented an Airbnb for her son. Ex. 3. Ms. Sheehan deposited $1,200 into the account the day after purchasing the theater tickets, but prior to renting the Airbnb. In addition, Ms. Sheehan used approximately $4,000 for car repairs to her truck. This amount is not documented in Exhibit 3 and occurred prior to January 2024. Ms. Sheehan transferred $5,000 from a different account to cover this cost. The parties used Quickbooks to manage their finances as shown in Exhibit D. The testimony from Ms. Nash, however, was that not all expenses were inputted into Quickbooks.

After Ms. Nash learned about Ms. Sheehan's use of the business account for personal expense, friction arose between the parties. Anytime the parties attempted to discuss money, the conversations ended prematurely and without resolution. Friction further escalated as Ms. Sheehan identified issues with Ms. Nash seeing patients without her being in the office. Antagonistic communications between Ms. Nash and the billing company further strained the parties' relationship. At one point Ms. Sheehan received notice from the power company that their electricity would be shut off for nonpayment after Ms. Nash assured her she was going to pay the bill. Ms. Nash also withdrew money from the business account on February 1, 2024, and February 5, 2024, however the testimony is unclear what those withdrawals were used for. There was also friction regarding the business' Medicare application being rejected on March 26, 2024. Ms. Sheehan blames Ms. Nash for that rejection for failing to follow through with an email request made in February. As a result of this rejection, the business will not be reimbursed by Medicare for patients seen prior to May 2024.

At the end of March 2024, Ms. Nash took a vacation to South Carolina. Ms. Nash discovered another charge to Airbnb on March 28, 2024, and assumed Ms. Sheehan's son was using the company debit card without permission. While Ms. Nash was on vacation, the relationship broke entirely. Ms. Sheehan removed Ms. Nash's access to the electronic medical records and the company email. On April 1,

2024, Ms. Sheehan filed an amendment to the Secretary of State removing Ms. Nash as a manager/member from the business. She did so without the consent or knowledge of Ms. Nash. On April 2, 2024, Ms. Nash sent Ms. Sheehan a Facebook message indicating she did not intend to return to the business. In May of 2024, Ms. Sheehan closed out the business account with Heritage Family Credit Union and started using an account at Citizens Bank for the business. *See* Ex. 6. Ms. Nash did not have access to the Citizens Bank account. Ms. Nash did not return to the business premises after she returned from vacation.

The court held a hearing on July 25, 2025, on Plaintiff's motion for a writ of attachment. At the time of the hearing, Ms. Sheehan testified the business had sustained a $14,000 loss and was operating in the red. The loss profit report indicated the business had a $24,000 loss between January 1, 2024, and April 3, 2024. Ex. F. After hearing testimony on July 25, 2025, the parties reached an agreement and the court issued a written entry order. The order required Ms. Sheehan to pay Ms. Nash $650 per month starting August 1, 2024. Ms. Sheehan has not made any of these payments. Ms. Sheehan testified the business was hemorrhaging money and was only staying afloat due to her second job and her husband's employment. As of the bench trial on December 17, 2024, the business had sustained a $89,507.84 loss. Ex. G.

Ms. Nash testified that primary care is lucrative and believes business expected to bill out between $300,000 and $500,000 yearly over a period of five years. This was based upon her conversations with Ms. Sheehan that she had been billing out over $300,000 at Forensics Consultants. Ms. Nash did not have any personal knowledge of the business' current financial situation.

Ms. Nash is seeking $30,000 for her initial investment in the business. Ms. Sheehan does not dispute she owes Ms. Nash $30,000. Ms. Nash is seeking $10,000 to account for one half of the business assets. Finally, Ms. Nash is seeking $100,000 in lost profits.

Decision on Merits of the Case

Plaintiff has alleged five separate causes of action: three as to Ms. Sheehan and two as to the business. The causes alleged against the business are for conversion and unjust enrichment in Count IV and respondeat superior in Count V. "Under the settled doctrine of respondeat superior, an employer or master is held vicariously liable for the tortious acts of an employee or servant committed during, or incidental to, the scope of employment." *Brueckner v. Norwich Univ.,* 169 Vt. 118, 122–23 (1999). The doctrine of respondeat superior is not so much a separate cause of action, but a theory of liability. In this case, Ms. Nash has not alleged actions by any other person in the business other than Ms. Sheehan. Thus any liability by the business would rest solely on the actions of Ms. Sheehan. For this reason, the court will simply analyze the claims of conversion, fraud, and unjust enrichment as to both Ms. Sheehan and the business as opposed to doing a separate analysis for each Defendant.

I.   Conversion

"To establish a claim for conversion, the owner of property must show only that another has appropriated the property to that party's own use and beneficial enjoyment, has exercised dominion over it in exclusion and defiance of the owner's right, or has withheld possession from the owner under a claim of title inconsistent with the owner's title." *IP.F. Jurgs & Co. v. O'Brien,* 160 Vt. 294, 299 (citing *Economou v. Carpenter,* 124 Vt. 451, 453-4 (1965)). Here, Plaintiff alleges the Defendants converted the business' bank funds, income, and business value without the right to do so. Before the court can decide whether

conversion occurred, the court must first decide whether Ms. Sheehan was a co-owner of Sheehan Health Care, PLLC.

An owner is defined as "[s]omeone who has the right to possess, use, and convey something; a person in whom one or more interests are vested." OWNER, Black's Law Dictionary (12th ed. 2024). Ms. Nash was clearly a co-owner of Sheehan Health Care, PLLC. The business plan prepared by Ms. Sheehan expressly identified Ms. Nash to be a managing owner of the business. Ex. 4, p. 4. Ms. Nash did not take a salary, even though she worked at the business. These are hallmarks of an owner, not an employee. Ms. Sheehan could not define what Ms. Nash's relationship was to the business other than assert she was not a co-owner. The court does not find this testimony credible.

In further support of this conclusion, her name was submitted by Ms. Sheehan to the Secretary of State in January 2024 as a manager for an LLC that was member-managed. Ex. 1. A member-managed LLC is a company that is managed by its members. 11 V.S.A. § 4001(19). A member is defined as "a person that has become a member of a limited liability company under section 4051 of this title and has not dissociated under section 4081 of this title." 11 V.S.A. § 4001(18). Ms. Nash became a member when Ms. Sheehan consented to making her a manager of a member-managed LLC in January 2024. 11 V.S.A. § 4051.

The manner in which a member may dissociate from an LLC is governed by 11 V.S.A. § 4081. The parties did not submit the operating agreement for the LLC, thus the only legally authorized removal of Ms. Nash from the LLC had to comply with Section 4081. One authorized manner is when the LLC receives "notice of the member's express will to withdraw upon the date of notice or, if a later withdrawal date is specified by the member, on the later date." 11 V.S.A. § 4081(1). Ms. Sheehan, the only other member of the LLC, received express notice from Ms. Nash on April 2, 2024, through Facebook that she did not intend to return to the business. This would have been sufficient for Ms. Sheehan to remove Ms. Nash from the LLC. However, this occurred after Ms. Sheehan had removed Ms. Nash from the LLC on April 1, 2024. On the date Ms. Sheehan removed Ms. Nash from the LLC, she was not authorized to do so under law. The fact Ms. Nash made a statement the following day that would have authorized dissociation does not cure the error. Ms. Sheehan wrongfully dissociated Ms. Nash from the LLC when she filed paperwork with the Secretary of State on April 1, 2024.

As noted by the Vermont Supreme Court, "[t]he key element of conversion . . . is the wrongful exercise of dominion over property of another." *P.F. Jurgs & Co.,* 160 Vt. at 299. Plaintiff has met her burden here. Ms. Sheehan wrongfully exercised dominion over Ms. Nash's ownership interest in the PLLC when she unlawfully dissociated Ms. Nash from the business. This was compounded by Ms. Sheehan removing Ms. Nash's access to electronic medical records, business email accounts, and business bank accounts. Ms. Sheehan's erroneous belief Ms. Nash was not a co-owner of the PLLC is not a defense. "Specific intent to convert, that is, knowledge that the property is owned by another, is not required for liability in tort." *Id.*

Although Plaintiff has proven Defendants' liability for conversion, she must still prove damages. "The measure of damages for conversion is generally the value of the thing converted at the time and place of conversion." *Murray v. J& B Intern. Trucks, Inc.,* 146 Vt. 458, 465 (1986) (citing *Redd Distributing Co. v. Bruckner,* 128 Vt. 635, 639 (1970)). Here, the value of the business at the time of the conversion, April 1, 2024, was zero. The business was operating at a loss of $24,000 and Plaintiff testified the value of the assets was only $20,000. Ex F. The damages for the conversion are therefore zero.

## II. Fraud and Misrepresentation.

"An action for fraud and deceit will lie upon an intentional misrepresentation of existing fact, affecting the essence of the transaction, so long as the misrepresentation was false when made and known to be false by the maker, was not open to the defrauded party's knowledge, and was relied on by the defrauded party to his damage." *Union Bank v. Jones,* 138 Vt. 115, 121 (1980). Here, Plaintiff alleges Ms. Sheehan engaged in a fraudulent scheme during the incorporation of the PLLC and "fraudulently took funds, converted the business property and income, and ultimately fraudulently took ownership of the company." Compl., ¶ 18. Plaintiff has not met her burden to prove fraud. There was no evidence of what fraud occurred at the incorporation of the PLLC. No facts were identified as false at the time the PLLC was incorporated. Plaintiff's other allegations of fraud mirror her claims for conversion. The conversion occurred after the PLLC was incorporated. Further, the Plaintiff has not identified what misrepresentation Ms. Sheehan made that would support a judgment in her favor on this claim. Plaintiff has not met her burden on this claim.

## III. Unjust Enrichment

"Under the doctrine of unjust enrichment, a party who receives a benefit must return the benefit if retention would be inequitable." *Kellogg v. Shushereba,* 2013 VT 76, ¶ 22. In order to succeed on an unjust enrichment claim, a "plaintiff must prove that (1) a benefit was conferred on defendant; (2) defendant accepted the benefit; and (3) defendant retained the benefit under such circumstances that it would be inequitable for defendant not to compensate plaintiff for its value." *Center v. Mad River Corp.,* 151 Vt. 408, 412 (1989). Here it is undisputed Ms. Nash took out a $30,000 unsecured loan to allow Ms. Sheehan to open a new business. Although operating at a loss, Ms. Sheehan obtained the benefit of opening the business as she was not able to do so alone due to her poor credit. Ms. Sheehan agrees she owes Ms. Nash $30,000. Plaintiff has met her burden of unjust enrichment with damages in the amount of $30,000.

### Decision of Plaintiff's Motion for Enforcement and/or Contempt

On November 29, 2024, Plaintiff filed a motion to enforce and/or for contempt alleging Defendants were not complying with the court's July 25, 2024, entry order. The entry order required Defendants to pay Plaintiff $650 per month starting August 1, 2024. It is undisputed that Defendants have failed to comply with this order and have not paid Plaintiff any money since the order was issued. As part of the motion, Plaintiff requested the court "freeze all assets including incoming payments, and liquidate the business." Plf.'s Nov. 29, 2024 Mot., p. 2. Plaintiff has subsequently indicated she is only seeking a monetary judgment. Plf.'s Jan. 16, 2024 Mot.

The court has the power to hold a party in contempt, and to impose appropriate sanctions, "to secure both 'the proper transaction and dispatch of business [and] the respect and obedience due to the court and necessary for the administration of justice." *State v. Allen,* 145 Vt. 593, 600 (1985) (quoting *In re Cooper,* 32 Vt. 253, 258 (1859)); see also 12 V.S.A. § 122 (empowering trial courts to hold parties that violate a court order in contempt). The purpose of contempt sanctions is to "provide courts with a means of coercing a party's compliance with orders where that party has refused to comply." *Town of Pawlet v. Banyai,* 2024 VT 13, ¶ 6. Because the purpose of civil sanctions is coercion, they cannot be punitive. *Id.* As such, coercive sanctions "must be purgeable, i.e., they must be capable of being avoided by defendants through adherence to the court's order." *Sheehan v. Ryea,* 171 Vt. 511, 512 (2000) (quotations and citations omitted).

Although civil contempt sanctions are not used to punish the offending party, the "court may impose fines in the appropriate case to compensate the victim." *Kneebinding, Inc. v. Howell,* 2018 VT 101, ¶¶ 73–74. Such prospective fines may only be levied in "extreme and extraordinary circumstances." *Id.* at ¶ 74, (quotation and citations omitted). The Plaintiff bears the burden of proving contempt by clear and convincing evidence. *Id.* at ¶ 68.

Here, Plaintiff has moved to enforce the July 25, 2024, entry order and for an order of contempt. Because the court is issuing final judgment, the prior order can no longer be enforced. *See Joseph v. Joseph,* 2014 VT 66, ¶ 15 ("we agree with those courts that have held that a final decree extinguishes the right to enforce an arrearage arising under a temporary order that has not been included in the final order or otherwise reduced to judgment."). The court, therefore, only considers whether Plaintiff has proven contempt by clear and convincing evidence.

As noted above, the July 25, 2024, entry order was a pre-final judgment order and the right to enforce it is extinguished by the issuance of the final judgment. *Id.* Contempt sanctions are either coercive or compensatory. *Kneebinding, Inc.,* 2018 VT 101, ¶ 74. Because the order is no longer enforceable, the court cannot coerce compliance. As such, the court is limited to contempt sanctions that are compensatory. The July 25, 2024, entry order required Defendants to pay $650 per month to offset the Plaintiff's loan payment for the $30,000 loan she took out to invest in the business. The court is granting Plaintiff judgment for that amount, as such Plaintiff is already being compensated for the loan amount. Issuing a compensatory contempt sanction would be duplicative and redundant. Plaintiff has not met her burden to prove a contempt sanction is warranted under these circumstances and her motion is DENIED.

<u>Conclusion</u>

For the foregoing reasons, judgment is entered for Plaintiff for $30,0000. A separate judgment order will issue. Plaintiff's motion for contempt and/or enforce is DENIED.

Electronically signed on March 3, 2025 pursuant to V.R.E.F. 9(d)

Alexander N. Burke
Superior Court Judge